[No. B050513. Second Dist., Div. One. Sept. 26, 1991.]

WILLIS EDWARDS, Plaintiff and Appellant, v.
ARSENIO HALL, Defendant and Respondent.

COUNSEL

Geraldine D. Green for Plaintiff and Appellant.

Haight, Brown & Bonesteel, Roy G. Weatherup, Morton G. Rosen, Theresa M. Marchlewski and Caitlin Doyle Berfield for Defendant and Respondent.

OPINION

**DEVICH, Acting P. J.**—Plaintiff Willis Edwards appeals from the summary judgment entered in favor of defendant Arsenio Hall in this defamation action. We find that triable issues of material fact exist and, accordingly, reverse the judgment.

BACKGROUND

In November 1988, Hall was in the preproduction phase of "The Arsenio Hall Show" (AHS), a nationally syndicated talk show. Edwards, who was then the president of the Beverly Hills/Hollywood chapter of the National Association for the Advancement of Colored People (NAACP), requested a meeting with Hall to discuss allegations that the hiring practices of AHS were discriminatory against Blacks. Such a meeting occurred on November 30, 1988 (the November 30 meeting).[1]

On January 5, 1989, following the premier of AHS, The Los Angeles Sentinel (The Sentinel) published an article wherein Edwards was quoted as stating: " 'Once again, we are being utilized as a viewing audience and as on-camera talent, but ignored in the key positions such as directors, producers or writers.' "[2]

Hall, upset both by Edwards's comments and by The Sentinel's failure to obtain his side of the story, arranged for an interview with The Sentinel, which took place on January 12, 1989 (The Sentinel interview). The following is a portion of the colloquy which transpired between one of the two reporters and Hall during the course of The Sentinel interview:

"[Hall:] I have a letter that Benjamin Hooks and a couple people in the higher levels at the NAACP sent me and made [Edwards] sign it, apologizing for his behavior.

"[Reporter:] Got copies of this?

---

[1]The November 30 meeting was attended by Hall, Robert Wachs and Mark Lipsky (Hall's managers), Marla Kell Brown (AHS's line producer), Harriet Cavette (Paramount Pictures Corporation's manager of equal employment opportunities), Steve Koppekin (Paramount Pictures Corporation's vice-president of labor relations), Minna Taylor (Paramount Pictures Corporation's director of employee relations and legal services), Frank Kelly (Paramount Pictures Corporation's vice-president of television), Edwards, Sherri Ford (Beverly Hills/Hollywood NAACP's executive secretary), John Forbes (a member of the Black Producers Union), and Shirley Moore (a prop master whom Edwards suggested should be hired by AHS).

[2]Throughout this opinion, quoted material has been reproduced without correction of either grammatical or typographical errors.

"[Hall:] Yes. I have copies of that letter. I also have a copy from the second in charge at the Beverly Hills branch of NAACP apologizing for the way he's handled the situation. Apologizing for going and making statements to the press that he said I said, um, and asking me if they could talk to me and start all over. And I'll explain something. Because there were things that were done that are good. Like in a meeting, he asked me for $40,000. See this wouldn't even . .

"[Reporter:] Why?

"[Hall:] He wanted a donation.

"[Reporter:] Did you give the man 40 k?

"[Hall:] No, absolutely. And I told my manager I'd whip his ass if he gave him 40. Cause what happened is I found out Ed Weinberger, who is the producer for . . Amen, which is a Carson production, see, I start wondering, why hasn't anybody been going to Merv and Carson. A lot of these people give donations to the NAACP. And they get left alone. They get left alone.

" . . . . . . . . . . . . . . . . . . . . . . . . .

"[Hall:] Find out how much Ed Weinberger has given a donation to Willis Edwards recently and see if he's been fucked with. See if Johnny Carson's been fucked with, see if Carson Productions gave some money.

"[Reporter:] [W]here [did Edwards] get the, the notion, that only six [Black] people [work for AHS?]

" . . . . . . . . . . . . . . . . . . . . . . . . .

"[Hall:] He got it because he asked me for $40,000 and I said kiss my Black ass. I hope the tape recorder is working.

"[Reporter:] Did you, did you give him a reason why, formally, why you didn't give him the money?

" . . . . . . . . . . . . . . . . . . . . . . . . .

"[Hall:] You know what . . . you know what. Okay, let me, let me clarify the situation so that you. First of all, I think he's a fuckin' extortionist and think he uses his position to ah. . . to take advantage . . .

"[.] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ."

"[Hall:] Of a lot of people . .

"[.] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ."

"[Hall:] And they're afraid of the pressure that he'll bring down.

"[.] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ."

"[Hall:] Because, think about it. I'm the first Black man ever to do a late night talk show and you've never heard this in relationship to Johnny Carson, Merv Griffin or anybody. There is something going on, brother. Think about it. I ain't givin' up no money. Now, let me tell you something else. Let me tell you something else. We aint goin to get into the fact that he was drunk when he came to my office.

"[Reporter:] Once again, don't get me wrong, but right, you didn't give him a reason why . . .

"[Hall:] That I didn't give him the money?

"[Reporter:] Yeah.

"[Hall:] Because I felt I was being extorted.

"[Reporter:] Okay. Great.

"[Hall:] Extorted.

"[Reporter:] Okay.

"[Hall:] Okay?

"[Reporter:] Great.

"[Hall:] I felt I was being extorted. I felt that, um, I felt that there had to be a reason why nobody before I was alive had been, you know, why ain't somebody on Johnny's case. I done a Johnny Carson Show. I went on there and they tried to make me act white, you know . . . it's like, that's how white it was. It was like when you get there, they try to make Black people white. It's like nobody has come down . . . And I was wondering, why is this happening? Somebody told me on the QT, they said, 'You know Ed Weinberger, Amen, you know, Ed Weinberger is with Carson Productions.' I

said, 'So?' Willis gets donations from them. And I said. 'Oh. I said Willis did ask me for $40,000.' "

On January 19, 1989, The Sentinel published an article discussing its interview with Hall under the headline "Hall: NAACP President 'An Extortionist.' "[3]

---

[3]The January 19, 1989, Sentinel article provided:

"The controversy that has local Black entertainment figures running in circles came to a head this week amid allegations of extortion, name-calling and all-around chaos.

"Actor/comedian Arsenio Hall, who had come under fire recently for allegedly failing to hire Blacks in top positions for his new late-night television program, 'The Arsenio Hall Show,' said in an interview that those allegations were totally false, and deliberately spurred by Willis Edwards, president of the Beverly Hills/Hollywood NAACP, who he said tried to extort $40,000 from him.

" 'We're not dealing with an issue of hiring Blacks, we're dealing with two Black men who have differences,' Hall said in an interview last Thursday at the Paramount studio where his show is taped.

" 'What saddens me is that two Black men are battling and airing their grievances in public when we have a larger picture that we're trying to draw,' he said.

"According to reports, members of the Beverly Hills/Hollywood NAACP met with Hall and representatives from Paramount Television during the last week in November to discuss possible inequities in the number of Blacks on the program's staff.

"Sources from the branch told the Sentinel last week that Hall expressed in the meeting that there were 'no qualified Blacks' to fill key positions on the production staff of 'The Arsenio Hall Show.'

"Hall said the charges were 'appalling' and 'insulting,' but maintained that the civil rights association is not the source of his troubles, but its leader is.

" 'My battle is not with the NAACP. I think the NAACP is a great organization. I wouldn't be where I am today if it weren't for men like Benjamin Hooks,' Hall said. 'My battle is with an individual—Willis Edwards.'

"That meeting—which, Hall said, ended on a good note—was followed by a conversation that took place between Hall, his managers and Edwards, he said.

"What transpired, Hall asserts, is the direct cause of the controversy.

"At this time, after all other NAACP representatives had left the room, Hall said, the NAACP president attempted to extort $40,000 from him for his branch.

" 'He (Edwards) was leaving the room (after the meeting) and he turns to my manager Bob Wax and says, "I'm going to think about this whole situation and do what I feel in my heart is right," ' Hall said.

"According to Hall, Edwards then said, 'You know, the NAACP could use a donation,' implying that if he complied, the NAACP would halt its protests.

"Wax could not believe his ears, Hall said, and neither could he.

" 'My manager just looked at him and said, "A donation?" and he said, "Yeah, $40,000." ' the entertainer claimed.

"But, in a telephone interview Tuesday night, Edwards denied the charge and called Hall 'a boldface liar.'

" 'I never asked Arsenio for a thing at that meeting or at any other time,' he said. 'Everybody who knows me knows that I'm not for sale. I cannot be bought.'

"But, according to Hall, money was on Edwards' mind on the afternoon in question.

" 'He gets a lot of "donations" from people. I think he's an extortionist and I think he uses his position to take advantage of a lot of people who are afraid of the pressure that he'll bring down,' he said.

"Edwards dismissed Hall's statements, calling them 'ridiculous.'

On January 14, 1989, Hall was interviewed by radio station KACE. The following excerpts are from the taped interview (the KACE interview):

"[Interviewer]: Well, there's an article on your wall outside, and you talk about black people and how much we must stick together. You come from Cleveland—a black neighborhood there—and it's obvious that you have the aims and objectives to help other black people get to positions that you are in, or producers, writers, etcetera. We know where your heart is. We just want to know what the timetable is.

"[Hall]: The timetable on what?

"[Interviewer]: Trying to hire more blacks so, you know, the ones—the positions that you have control over, trying to get blacks into those positions.

"[Hall]: How many blacks do I have working for me?

"[Interviewer]: I have no idea. I am here for you to set the record straight.

"[Hall]: Okay, so let's not start by making an assumption that the amount of blacks that should be in my regime aren't there already. They are there. I've read one article where somebody said there were no blacks working for my show. I read an article where they said six blacks were working for my

---

" 'He doesn't even have enough respect for the NAACP to pay for a $10 membership and join it,' He said. 'How could I expect to get $40,000 from him?'

"Edwards said Hall did indeed assert at their meeting that there were 'no qualified Blacks' for key posts on his production staff.

" 'He made that statement, and he knows he made it,' Edwards said. 'Nobody Black is getting any jobs down there. The show is aimed at the urban market—why watch something on TV that you can't get a job at?'

"But, Hall said, he *is* hiring Blacks, at a rate unmatched by any other late-night host.

"In fact, Hall read off a list of more than 20 Blacks who work in key positions for 'The Arsenio Hall Show.'

"People on that list include Black talent coordinator Kim Swann, whom he recruited from Burt and Bert, an entertainment company run by Burt Reynolds and Bert Convy.

"Hall's assistant lighting technician, chief prop master and announcer are all Black, as well as some of the pages, the wardrobe director and his production manager, Corky Lee, he said.

" 'Nothing happens on Stage 29 (where the show is taped) without Corky's permission,' he said.

"Hall also hired Black female drummer Terri Lynn Carrington. His talent executive and his assistant are Black, as are two of the four cameramen, he said.

" 'These aren't people that came here and applied,' he said. 'I went and found them.'

" 'I have people who are mad at me (for example) at Entertainment Tonight and in the executive building on this Paramount lot because I've gone into places stealin' folk,' he said.

" 'Not only do I have more than six Blacks, but I have Blacks in key positions. Not only do I have Blacks in key positions, but the baddest m..f.. in this building (show) is me.' "

show. I have six blacks just, you know, probably there now. And the show won't start for hours. I've gone to companies like Burt & Bert, which is Burt Reynolds and Bert Convey, and stolen blacks. I have people at Paramount mad at me because I have gone around the lot and taken competent people from different areas of Paramount's operation and brought them to my organization because I know they're good, I know them. The whole thing with Willis Edwards and I started when he brought someone into my office that wanted a job—a friend of his—someone who was a prop master. A lady named Shirley he brought in. and he said, 'I want you to hire her.' and I said, 'get out of here,' you know? (laughter) And basically, um, basically I think he thought that I was—I, I—discriminated against her, because she was black? But I'm black, and I don't think that's really possible. As a matter of fact, I have a black prop master. But it's her I wasn't going to hire. I won't allow him to manipulate me and decide what he thinks I should do, nor will I donate $40,000 to him, as he asked me on that particular day. But we can get real deep. Deep to the point where I don't think you want to go. I have blacks working for me.

"[Second interviewer]: One of the problems with Willis Edwards, why would Willis Edwards want to hold Arsenio Hall hostage and use the NAACP as the weapon?

"[Hall]: It's interesting. Um, I was asked for a donation of $40,000. I was asked—standing at that door with my manager—he was looking in my manager's direction. I turned to my manager and I said, 'you give him nothing,' nothing. And, um, the sad thing is that in the effort—in my effort to change history, to be the first black man to do what I'm doing success- fully, my biggest stumbling block has been a black man telling people not to watch my show."

On January 20, 1989, Edwards filed a complaint alleging causes of action for defamation by way of libel[4] and slander,[5] and intentional infliction of emotional distress.

---

[4]Civil Code section 45 defines libel as "a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation."

[5]Civil Code section 46, in pertinent part, defines slander as "a false and unprivileged publication, orally uttered, and also communications by radio or any mechanical or other means which: [¶] 1. Charges any person with crime, or with having been indicted, convicted, or punished for crime; . . . [¶] 3. Tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects in which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade or business that has a natural tendency to lessen its profits . . . ."

On February 9, 1990, Hall moved for summary judgment. In support of this motion, Hall filed a declaration wherein he stated:

"As I recall, near the conclusion of the meeting Edwards asked to speak privately with Robert Wachs, my manager. It was immediately reported to me by Wachs that Edwards stated to Wachs that the entire dispute would 'turn out alright,' and 'by the way I need $40,000 for the Image Awards television show.' Wachs also stated that he had the 'clear impression' that he was being pressured to donate money in exchange for Edwards agreeing to refrain from any further attacks on me or The Arsenio Hall Show.

". . . I was extremely upset with what Wachs told me. I found it offensive that, as related to me, Edwards had attempted to solicit a donation to the Image Awards' show at the culmination of the meeting. I had no reason then, and still have no reason, to disbelieve anything that Wachs told me regarding this conversation. I did, however, feel that Edwards was unfairly attempting to exert significant pressure on me by levying charges of discrimination and then indicating they would 'turn out alright' if I made a substantial donation to his organization. I therefore advised Wachs that under no circumstances would I agree to such a donation. I took this position primarily because I did not like being pressured, especially as Edwards had indicated that 'some people' might picket my television show.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

". . . I was extremely upset at the January 5, 1989 Sentinel article, due to its factual misstatements, and because no one from the Sentinel had called me to discuss the allegations or obtain the actual facts or my position. I therefore agreed to be interviewed by Sheena Lester and Gene Johnson of the Los Angeles Sentinel. In agreeing to this interview, I was attempting to set the record straight and refute the misstatements made in the January 5, 1989 Sentinel article. . . .

". . . During the interview, I was extremely agitated as a result of the charges leveled against me and the fact that the Sentinel had run the story without seeking my comment or explanation. . . . I explained to the Sentinel reporters that I felt Edwards' position was entirely unfounded, as he or the NAACP had hired the very white set director they criticized me for considering. I detailed to Lester and Johnson my anxiety and upset regarding the NAACP charges and demonstrated that I had hired a significant number of Blacks despite Edwards' claim to the contrary. In response to their continual questions on the subject I explained to Lester and Johnson that I believed Edwards had been exerting undue and unjustified pressure in an

attempt to obtain a donation for the Image Awards show. This belief was based on the information provided to me by Wachs.

". . . Throughout my entire interview with Lester and Johnson, I was expressing my opinion as to what I believed Edwards and the NAACP was doing, including the exertion of unjustified pressure on me with the threat of reprisal. I attempted to describe my impression of the pressure exerted by Edwards by indicating that I believed or felt that I was being extorted by him. At no time did I intend to say that I accused Edwards with having committed a crime. I am not an attorney or police officer, nor have I studied law. I utilized the word 'extortion' as a synonym for unfair pressure, and made it clear I was expressing what I felt and believe.

". . . I admit I was extremely upset and irate at the charges that had been made against me by Edwards and the NAACP. While I may have utilized some profane language during the Sentinel interview, after the interview was over I recall that the reporters were requested by Harriett Cavette to refrain from utilizing any such language in their article. It was my belief and understanding that they would comply with that request.

". . . After the interview, I had no further communications or correspondence with Sheena Lester, Gene Johnson or anyone at the Los Angeles Sentinel. I had no input or veto over the contents of the article which appeared in the Sentinel relating to my interview with them. In short, I had no power or control over what words the Sentinel elected to utilize in the article which I believe was published on January 19, 1989. . . .

". . . On January 13, 1989, I was interviewed by Isidra Person-Lynn and Mark Whitlock of KACE radio in Los Angeles for the Sunday Morning Live radio talk show. . . . As in the Sentinel interview, the majority of my comments to the KACE reporters were defensive in nature, detailing the number and responsibilities of the Blacks which I had hired. I only referred to a 'donation' on two occasions, specifying that I would not allow Edwards to manipulate me or decide what I should do nor would I donate $40,000 to him as he asked. At no time during the KACE interview did I use the word 'extort' or accuse Willis Edwards of committing a crime. As in the Sentinel interview, I responded to questions posed to me by Person-Lynn and Whitlock, providing them with my opinion regarding the dispute and why and how Edwards had instigated it.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

". . . I did not instigate the dispute with Willis Edwards or the NAACP. At the culmination of the meeting on November 30, 1988, I had no inkling

that Edwards would go public with his claims that The Arsenio Hall Show discriminated against Blacks. I certainly did not expect that a news article of the tenor of the January 5, 1989 Sentinel article would be published in a local Black newspaper. I personally would not have resorted to the media regarding my disagreement with Edwards. I did nothing to create a public debate regarding The Arsenio Hall Show's hiring practices; however, once Edwards instigated the debate, I believed it was in my best interest, personally and professionally, to present my side of the story."

A declaration submitted by Wachs indicated that, "[a]t the conclusion of the [November 30] meeting, Willis Edwards asked to speak privately with me. During this private conversation, Edwards stated that the entire matter would 'turn out alright' and stated that 'by the way I need $40,000 for the Image Awards television show.' I advised Edwards that I would get back to him, which I never did. I then returned to Hall's office and advised Hall and Mark Lipsky of the conversation with Edwards which had just occurred. I recall Hall saying that he 'didn't believe it.' Hall also refused to pay any funds. [¶] . . . Because of Edwards' language and demeanor, I believe that he was clearly attempting to pressure Hall into providing funds for the NAACP in exchange for his agreeing to refrain from any further attack on Hall or The Arsenio Hall Show. It was my clear impression and feeling that we were being pressured to provide money in order to get Edwards 'off Hall's back.' I also reported this to Hall."

In a declaration, Cavette stated: "At no time during the [Sentinel] interview did I understand that Hall was charging Willis Edwards with the commission of a crime. While Hall described his opinion of Edwards in words which led one to the conclusion that he held him in less than high esteem, Hall's comments regarding Edwards were clearly angry statements of opinion. [¶] . . . In light of Hall's obvious anxiety, after the interview was over, as the reporters were leaving, I requested that they not print the remarks which Hall had made about Edwards. I specifically recall Mr. Johnson stating 'we are reporters and we are here for a story.' "

In opposition to Hall's motion for summary judgment, Edwards filed a declaration indicating:

". . . At no time did I request or demand any donation of any money from Mr. Hall or anyone else at the [November 30] meeting for myself or for the NAACP.

". . . At no time during the meeting did I have any private discussion with Mr. Robert Wachs.

". . . Throughout the entire meeting, I was in the company of Miss Sherri Ford and we left the meeting together.

". . . The meeting took place in Mr. Arsenio Hall's office which was a moderate sized room but somewhat crowded with the number of people attending the meeting.

". . . There was no time during the meeting when I was out of earshot of Miss Ford and she was able to hear everything I had to say at the meeting."

In a declaration, Ford stated:

". . . I accompanied Mr. Edwards to the [November 30] meeting and was with him throughout the entire meeting.

". . . At no time during the course of the meeting did Mr. Edwards make a request or demand for a donation of $40,000.00 or any other amount of money for himself, the NAACP or anyone else.

". . . There was no time during the meeting that Mr. Edwards left my hearing and presence to meet privately with Mr. Robert Wachs or anyone else.

". . . Mr. Edwards and I left the meeting together.

". . . . . . . . . . . . . . . . . . . . . . . . . . .

". . . It would not have been possible during the course of that meeting for Mr. Edwards to make a request or demand for money from anyone at that meeting without me hearing it."

Edwards also submitted excerpts of transcripts from The Sentinel and KACE interviews.

In granting Hall's motion for summary judgment, the trial court found: (1) Hall's statements were opinions, not facts; (2) "the context of the communications indicates [Hall's] statements cannot [] reasonably be interpreted by a fact-finder as charging [Edwards] with a crime"; and (3) Edwards failed to produce clear and convincing evidence that, at the time Hall made the statements, he did so with knowledge of their falsity or reckless disregard of whether they were false.

## Standard of Review

█ In defamation actions brought by a public figure,[6] the ordinary rules of summary judgment are inapplicable. Rather, in such cases, where the plaintiff must prove "constitutional malice"[7] by clear and convincing evidence (*New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 279-280, 285-286 [11 L.Ed.2d 686, 706-707, 709-710, 84 S.Ct. 710, 95 A.L.R.2d 1412]), " 'because unnecessarily protracted litigation would have a chilling effect upon the exercise of First Amendment rights, speedy resolution of cases involving free speech is desirable. [Citation.] Therefore, summary judgment is a favored remedy, and upon such a motion the trial court must determine whether there is a sufficient showing of malice to warrant submission of that issue to the jury.' [Citation.] Court of Appeal decisions echo this approving view of summary judgment, though cautioning that summary disposition is not appropriate if a triable issue of fact exists. [Citations.]

" . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

█ " . . . '[T]he standard of review of First Amendment defamation actions, as in all summary judgment cases, is whether the record, construed in a light most favorable to the party against whom the judgment has been entered, demonstrates there are genuine issues of fact which, if proven, would support a jury verdict for that party. Since, however, a jury verdict in a defamation case can only be supported when the actual malice is shown by clear and convincing evidence, rather than by a preponderance of evidence as in most other cases, [citation], the evidence and all the inferences which can reasonably be drawn from it must meet the higher standard.' [Citation.]" (*Reader's Digest Assn.* v. *Superior Court* (1984) 37 Cal.3d 244, 251-252 [208 Cal.Rptr. 137, 690 P.2d 610]; see also *Anderson* v. *Liberty Lobby, Inc.* (1986) 477 U.S. 242, 252-254 [91 L.Ed.2d 202, 214-216, 106 S.Ct. 2505].)

The rule "that the clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions does not denigrate the role of the jury. It by no means authorizes trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The

---

[6]Edwards concedes that, for purposes of this litigation, he is a public figure.

[7]Following the recent suggestion of the United States Supreme Court in *Masson* v. *New Yorker Magazine, Inc.* (1991) 501 U.S. __, __, [115 L.Ed.2d 447, 467-470, 111 S.Ct. 2419, 2429-2430], we shall use the term "constitutional malice" instead of "actual malice" so as to avoid the misplaced notion, permeating Edwards's briefs, that a showing of spite or ill will may satisfy a public figure plaintiff's burden of proof.

evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. [Citation.] Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial. [Citation.]" (477 U.S. at p. 255 [91 L.Ed.2d at p. 216].)

DISCUSSION

1. *Statement of Fact Versus Opinion*

 In support of the trial court's ruling on his motion for summary judgment, Hall argues that, as a matter of law, his comments were non-defamatory statements of opinion, rather than assertions of fact. We disagree.

In *Milkovich* v. *Lorain Journal Company* (1990) 497 U.S. 1, __ [111 L.Ed.2d 1, 110 S.Ct. 2695], the United States Supreme Court recently set forth the contours of the fact versus opinion issue under the First Amendment to the United States Constitution.[8] In this case, a local high school coach sued a reporter and a newspaper after it published an article under the headline " '. . . Diadiun [the reporter] says Maple told a lie.' " (497 U.S. at p. __ [111 L.Ed.2d at pp. 8-9, 110 S.Ct. at p. 2695].) In the article, the reporter accused the coach of having lied at a judicial hearing, and concluded: " ' "Is that the kind of lesson we want our young people learning from their high school administrators and coaches? [¶] I think not." ' [Citation.]" (*Ibid.*, fn. omitted.)

The United States Supreme Court reversed a summary judgment premised on the notion of a constitutionally based opinion exception to the law of defamation. Tracing the broad constitutional protections given to speech, the court stated:

"[W]e think *Hepps*[9] stands for the proposition that a statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least in situations, like the present, where a

___

[8]Curiously, Edwards does not address the *Milkovich* opinion in his opening brief, instead relying upon lower federal court decisions. Despite Edwards's omission, Hall discusses the *Milkovich* opinion in his respondent's brief. Although we disagree with Hall's attempt to distinguish *Milkovich* from the case at bench, we nonetheless appreciate the forthright manner with which Hall's brief was prepared.

[9]*Philadelphia Newspapers, Inc.* v. *Hepps* (1986) 475 U.S. 767 [89 L.Ed.2d 783, 106 S.Ct. 1558].

media defendant is involved. . . . *Hepps* ensures that a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection.

"Next, the *Bresler-Letter Carriers-Falwell* [10] line of cases provide protection for statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual. [Citation.] This provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation. [Citation.]

"The *New York Times-Butts* and *Gertz* [11] culpability requirements further ensure that debate on public issues remains 'uninhibited, robust, and wide-open,' [citation]. Thus, where a statement of 'opinion' on a matter of public concern reasonably implies false and defamatory facts regarding public figures or officials, those individuals must show that such statements were made with knowledge of their false implications or with reckless disregard of their truth. Similarly, where such a statement involves a private figure on a matter of public concern, a plaintiff must show that the false connotations were made with some level of fault as required by *Gertz*. ▪ Finally, the enhanced appellate review required by *Bose Corp.*, [12] provides assurance that the foregoing determinations will be made in a manner so as not to 'constitute a forbidden intrusion of the field of free expression.' [Citation.]" (497 U.S. at pp. __-__, fns. omitted [111 L.Ed.2d at pp. 18-19, 110 S.Ct. at pp. 2706-2707].)

Following this recitation, the court concluded: "We are not persuaded that, in addition to these protections, an additional separate constitutional privilege for 'opinion' is required to ensure the freedom of expression guaranteed by the First Amendment." (497 U.S. at p. __ [111 L.Ed.2d at p. 19, 110 S.Ct. at p. 2707].)

▪ The dispositive question a court needs to answer in determining whether a false statement is actionable is: Could a reasonable trier of fact conclude the published statements imply a provably false factual assertion?

[10]*Greenbelt Pub. Assn.* v. *Bresler* (1970) 398 U.S. 6 [26 L.Ed.2d 6, 90 S.Ct. 1537]; *Old Dominion Branch No. 496, etc.* v. *Austin* (1974) 418 U.S. 264 [41 L.Ed.2d 745, 94 S.Ct. 2770]; *Hustler Magazine* v. *Falwell* (1988) 485 U.S. 46 [99 L.Ed.2d 41, 108 S.Ct. 876].

[11]*New York Times Co.* v. *Sullivan, supra,* 376 U.S. 254; *Curtis Publishing Co.* v. *Butts* (1967) 388 U.S. 130 [18 L.Ed.2d 1094, 87 S.Ct. 1975]; *Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323 [41 L.Ed.2d 789, 94 S.Ct. 2997].

[12]In *Bose Corp.* v. *Consumers Union of U.S., Inc.* (1984) 466 U.S. 485, 499 [80 L.Ed.2d 502, 515, 104 S.Ct. 1949], the United States Supreme Court held "that in cases raising First Amendment issues . . . an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.' [Citations.]"

(497 U.S. at p. __ [111 L.Ed.2d at p. 19, 110 S.Ct. at p. 2707].) In answering this question in the affirmative, the *Milkovich* court relied on the following three factors: (1) whether "[t]his [was] the sort of loose, figurative or hyperbolic language which would negate the impression that the writer was seriously maintaining [the plaintiff] committed the crime of perjury"; (2) whether "the general tenor of the article negate[s] this impression"; and (3) whether "the connotation that [the plaintiff] committed perjury is sufficiently factual to be susceptible of being proved true or false." (*Ibid.*)

### a. The Milkovich Approach

#### i. The Type of Language Used

As noted above, in The Sentinel interview, Hall called Edwards an "extortionist." While this accusation, standing alone, is arguably hyperbolic (compare *Greenbelt Pub. Assn.* v. *Bresler, supra,* 398 U.S. at pp. 13-14 [26 L.Ed.2d at pp. 14-15] [use of the word "blackmail" to describe a real estate developer's bargaining position was not actionable since "[n]o reader could have thought [the developer was being charged] with the commission of a criminal offense"]), Hall went on to explain the exact nature of his accusation, i.e., that Edwards was wrongfully using his position as president of the Beverly Hills/Hollywood branch of NAACP to solicit contributions by either threatening to create a public controversy without foundation or indicating a willingness to ignore a legitimate issue of concern in exchange for a donation.[13] Taken in the context of Hall's surrounding statements, rather than negating the impression that Hall seriously maintained Edwards was an extortionist, such a view was reinforced.[14]

---

[13]In the course of The Sentinel interview, Hall stated: "I start[ed] wondering, why hasn't anybody been going to Merv and Carson. A lot of these people give donations to the NAACP. And they get left alone." "Find out how much Ed Weinberger has given [as] a donation to Willis Edwards recently and see if he's been fucked with. See if Johnny Carson's been fucked with, see if Carson Productions gave some money." "First of all, I think [Edwards is] a fuckin' extortionist and think he uses his position . . . to take advantage . . . [o]f a lot of people. . . . And they're afraid of the pressure that he'll bring down." While not all of these comments appeared in the January 19, 1989 Sentinel article, those that did convincingly express Hall's message.

[14]In determining whether statements are of a defamatory nature, and therefore actionable, " 'a court is to place itself in the situation of the hearer or reader, and determine the sense or meaning of the language of the complaint for libelous publication according to its natural and popular construction.' That is to say, the publication is to be measured not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the average reader." (*MacLeod* v. *Tribune Publishing Co.* (1959) 52 Cal.2d 536, 547 [343 P.2d 36].)

Webster's Third New International Dictionary (1976) at page 806 defines "extort" as follows: "[T]o obtain from an unwilling or reluctant person by physical force, intimidation, or the abuse of legal or official authority."

Black's Law Dictionary (5th ed. 1979) at page 525 defines "extort" as follows: "To compel or coerce, as a confession or information by any means serving to overcome one's power of

#### ii. *The Tenor of the Comments*

Nothing in The Sentinel interview indicates Hall was anything less than completely serious in his accusations.

#### iii. *Susceptibility of Proof*

Whether Edwards wrongfully demanded $40,000 to either refrain from creating an unfounded controversy or to "look the other way" is "sufficiently factual to be susceptible of being proved true or false." (*Milkovich, supra,* 497 U.S. at p. __ [111 L.Ed.2d at p. 19, 110 S.Ct. at p. 2707].)

Accordingly, under *Milkovich*, we conclude Hall's comments were actionable.

### b. *Application of the California Constitution*

■ Relying on *Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254 [228 Cal.Rptr. 206, 721 P.2d 87], Hall asserts that, regardless of what *Milkovich* may dictate under the First Amendment to the United States Constitution, the California Constitution, article I, section 2, subdivision (a), provides broader protection to freedom of speech and protects statements of opinion, requiring that the summary judgment be affirmed. We disagree.

In *Baker*, the producer of a documentary film brought a defamation action against a television reviewer who severely criticized the documentary. In the course of the critique, the reviewer wrote: " 'My impression is that the executive producer Walt Baker . . . told his writer/producer, Phil Reeder, "We've got a hot potato here—let's pour on titillating innuendo and as much bare flesh as we can get away with. Viewers will eat it up!" ' " (42 Cal.3d at p. 258.) After quoting dictum from *Gertz v. Robert Welch, Inc., supra,*

---

resistance, thus making the confession or admission involuntary. To gain by wrongful methods; to obtain in an unlawful manner, as to compel payments by means of threats of injury to person, property, or reputation. To exact something wrongfully by threats or putting in fear. The natural meaning of the word 'extort' is to obtain money or other valuable thing either by compulsion, by actual force, or by the force of motives applied to the will, and often more overpowering and irresistible than physical force."

Penal Code section 518 defines "extortion" as follows: "[T]he obtaining of property from another with his consent, or the obtaining of an official act of a public officer, induced by a wrongful use of force or fear, or under color of official right."

418 U.S. at pages 339-340 [41 L.Ed.2d at pp. 804-806],[15] the *Baker* court held:

"California courts have developed a 'totality of the circumstances' test to determine whether an alleged defamatory statement is one of fact or of opinion. First, the language of the statement is examined. For words to be defamatory, they must be understood in a defamatory sense. [Citations.] Where the language of the statement is 'cautiously phrased in terms of apparency,' the statement is less likely to be reasonably understood as a statement of fact rather than opinion. [Citation.]

"Next, the context in which the statement was made must be considered. Since '[a] word is not a crystal, transparent and unchanged, [but] is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used[,]' the facts surrounding the publication must also be carefully considered. [Citation.]

"This contextual analysis demands that the courts look at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed. [Citation.] '"[T]he publication in question must be considered in its entirety; '[i]t may not be divided into segments and each portion treated as a separate unit.' [Citation.] It must be read as a whole in order to understand its import and the effect which it was calculated to have on the reader [citations], and construed in the light of the whole scope and apparent object of the writer, considering not only the actual language used, but the sense and meaning which may have been fairly presumed to have been conveyed to those who read it. [Citation.] If the publication so construed is not reasonably susceptible of a defamatory meaning and cannot be reasonably understood in the defamatory sense pleaded, the demurrer was properly sustained. [Citations.]" ' [Citations.]" (*Baker, supra*, 42 Cal.3d at pp. 260-261, fn. omitted.) Applying the "totality of the circumstances" test to the case before it, the *Baker* court determined that the trial court properly sustained a demurrer to the complaint since "the disputed statement was unambiguously one of opinion rather than fact." (*Id.* at p. 269.)

Initially, we note that *Baker* neither discussed nor rested upon article I, section 2, subdivision (a) of the California Constitution; the decision rested solely upon the First Amendment to the United States Constitution.

---

[15]The *Gertz* court stated: "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." (*Gertz* v. *Robert Welch, Inc., supra*, 418 U.S. at pp. 339-340 [41 L.Ed.2d at pp. 804-806].)

Furthermore, *Baker,* and many cases like it,[16] drew a distinction between statements of fact and opinion based on dictum contained in *Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. at pages 339-340 [41 L.Ed.2d at pp. 804-806]. The *Milkovich* court expressly disavowed the premise of these cases, stating "the ' "breathing space" ' which ' "freedoms of expression require in order to survive," ' [citations], is adequately secured by existing constitutional doctrine without the creation of an artificial dichotomy between 'opinion' and fact." (497 U.S. at p. __ [111 L.Ed.2d at p. 18, 110 S.Ct. at p. 2706]; see also *Moyer* v. *Amador Valley J. Union High School Dist.* (1990) 225 Cal.App.3d 720, 723 [275 Cal.Rptr. 494].)

Moreover, in rejecting a media defendant's contention that, under the California Constitution, a nonpublic figure plaintiff should be required to prove constitutional malice, the California Supreme Court recently held:

"Article I, section 2, subdivision (a) of the California Constitution states, 'Every person may freely speak, write and publish his or her sentiments on all subjects, *being responsible for the abuse of this right.* A law may not restrain or abridge liberty of speech or press.' (Italics added.) This provision makes clear that the right to speech is not unfettered and reflects a considered determination that the individual's interest in reputation is worthy of constitutional protection. The federal Constitution, by contrast, contains no express provision imposing responsibility for abuse of the right of free speech. This difference refutes defendants' policy argument that our state Constitution weighs in favor of a standard of fault higher than that required under the federal Constitution.

"Society's interest in the value of a private person's reputation weighs against the judicial creation of a privilege (whether by construing a statute or the common law) that would impose burdens greater than those already required under the federal Constitution." (*Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 746 [257 Cal.Rptr. 708, 771 P.2d 406], fn. omitted.)

Although the *Brown* court was concerned with whether a higher degree of fault should be required under the state Constitution, an issue not involved in the case at bench, "the *Brown* court's extensive refutation of the policy arguments advanced in favor of expanded constitutional protection for media defendants [is] a clear signal that such expansion is not warranted under our state Constitution. [Citation.]" (*Weller* v. *American Broadcasting*

---

[16]See, for example, *Okun* v. *Superior Court* (1981) 29 Cal.3d 442 [175 Cal.Rptr. 157, 629 P.2d 1369]; *Gregory* v. *McDonnell Douglas Corp.* (1976) 17 Cal.3d 596 [131 Cal.Rptr. 641, 552 P.2d 425]; and *Hofmann Co.* v. *E. I. Du Pont de Nemours & Co.* (1988) 202 Cal.App.3d 390 [248 Cal.Rptr. 384].

*Companies, Inc.* (1991) 232 Cal.App.3d 991, 1007 [283 Cal.Rptr. 644], fn. omitted.)

Finally, even if we were to assume the continued vitality of *Baker*'s approach on independent state grounds (compare *Michigan* v. *Long* (1983) 463 U.S. 1032, 1040-1041 [77 L.Ed.2d 1201, 1213-1215, 103 S.Ct. 3469]), Hall's comments are nonetheless actionable. Under *Baker*'s "totality of circumstances" test, taking into account both the language used and the context in which the statements were made, an average listener to these statements could reasonably understand the statements to be of a factual nature.

## 2. *Constitutional Malice*

As previously noted, "[w]hen, as here, the plaintiff is a public figure, he cannot recover unless he proves by clear and convincing evidence that the defendant published the defamatory statement with actual malice, i.e., with 'knowledge that it was false or with reckless disregard of whether it was false or not.' [Citation.] Mere negligence does not suffice. Rather the plaintiff must demonstrate that the author 'in fact entertained serious doubts as to the truth of his publication,' [citation], or acted with a 'high degree of awareness of . . . probable falsity,' [citation]." (*Masson* v. *New Yorker Magazine, Inc., supra*, 501 U.S. at p. __ [115 L.Ed.2d at p. 468, 111 S.Ct. at p. 2429].)

■ Hall asserts the trial court properly determined Edwards cannot prove constitutional malice by clear and convincing evidence. We disagree.

Constitutional malice would certainly be lacking should a trier of fact believe Hall's and Wachs's testimony that, in a private conversation with Wachs, Edwards demanded a $40,000 donation in order to make the discrimination controversy disappear, that this demand was subsequently disclosed to Hall by his trusted manager, and that Hall had no reason to disbelieve the truth of this disclosure. Had this been the only evidence presented to the trial court on Hall's motion for summary judgment, the motion would have had to have been granted. However, this was not the case.

Edwards presented evidence not only demonstrating that the demand was never made, but that Hall's own statements in The Sentinel and KACE interviews indicated either that the demand was made directly to him or that

he was a percipient witness to the demand made upon Wachs.[17] Given this evidence, a trier of fact could reasonably conclude either that Hall's evidence regarding the "private conversation" and the demand was fabricated or that Hall, if his statements to the media are taken literally, claimed to have heard Edwards's demand. If a trier of fact further believed Edwards's and Ford's testimony that a demand had never been made, then Hall necessarily would have had actual knowledge of the falsity of his statements. (See *Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d at p. 257 ["actual malice can be proved by circumstantial evidence"].)

This is precisely the type of case the United States Supreme Court was referring to in recognizing "that the clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions does not denigrate the role of the jury. It by no means authorizes trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. [Citation.] Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial. [Citation.]" (*Anderson* v. *Liberty Lobby, Inc., supra,* 477 U.S. at p. 255 [91 L.Ed.2d at p. 216].)

In light of the sharply contrasting versions of the events which transpired at the November 30 meeting, as well as the conflicting inferences which may reasonably be drawn from the evidence, we conclude triable issues of material fact exist.

## 3. *Common Law Right of Fair Comment*

Hall attempts to invoke the common law right of fair comment, long recognized in California, "which protect[s] 'expressions of opinion about public officials, scientists, artists, composers, performers, authors, and other persons who place themselves or their work in the public eye.' [Citation.]" (*Brown* v. *Kelly Broadcasting Co., supra,* 48 Cal.3d at p. 732.) "In California,

---

[17]These statements include: "Like in a meeting, he asked me for $40,000"; "He got it because he asked me for $40,000 and I said kiss my Black ass"; " 'Oh. I said Willis did ask me for $40,000' "; "I won't allow him to manipulate me and decide what he thinks I should do, nor will I donate $40,000 to him, as he asked me on that particular day"; "I was asked for a donation of $40,000. I was asked—standing at that door with my manager—he was looking in my manager's direction. I turned to my manager and I said, 'you give him nothing,' nothing."

. . . the cases have extended the fair comment privilege so that, where malice is disproved, the privilege applies not only to comment (opinions) but to false statements of fact as well. [Citation.]" (*Institute of Athletic Motivation* v. *University of Illinois* (1980) 114 Cal.App.3d 1, 8-9, fn. 4 [170 Cal.Rptr. 411].)

As we have held in section 2, *ante*, the case at bench presents triable issues of material fact regarding the existence of constitutional malice. Accordingly, the right of fair comment does not, as a matter of law, offer Hall insulation from Edwards's defamation action.

## DISPOSITION

The judgment entered in favor of defendant Arsenio Hall is reversed. Plaintiff Willis Edwards shall recover his costs on appeal.

Ortega, J., and Vogel, J., concurred.

Respondent's petition for review by the Supreme Court was denied January 23, 1992.