[No. H009444. Sixth Dist. June 30, 1933.]

ARAM B. JAMES, Plaintiff and Appellant, v.
SAN JOSE MERCURY NEWS, INC., et al., Defendants and Respondents.

2

## COUNSEL

Brown, Hall, Clair & McKinley, Steven A. Clair, Joseph A. Varni and Howard C. Anawalt for Plaintiff and Appellant.

Pillsbury, Madison & Sutro, Edward P. Davis, Jr., Kevin M. Fong and Judy Alexander for Defendants and Respondents.

## OPINION

**BAMATTRE-MANOUKIAN, J.**—Aram B. James, an attorney employed by a county public defender's office, sued a newspaper and one of its employees for libel. The employee, acting as a bylined columnist for the newspaper, had written, and the newspaper had printed, a column which named James in the context of a discussion of asserted violations of law by defense attorneys in criminal cases involving child victims. The defendants moved for summary judgment. The motion was granted and judgment was entered for the defendants. James appeals. We shall affirm the judgment.

The basic facts are not disputed.

James had been assigned to defend an individual accused of felonies, including attempted sexual molestation, allegedly committed against. three children.

In the course of trial preparation James asked a public defender's investigator to subpoena the school records of the victims. His subsequently stated purpose was "[t]o determine whether there was any support for the theory that the children were fabricating the versions of the different incidents that they described to the police." It appears that James authorized the investigator to sign, in James's name, both the subpoenas duces tecum and affidavits to support them, and that the investigator did so.

On or about January 4, 1990, the investigator served the subpoenas on custodians of records at the three schools attended by the victims. Each subpoena specified on its face that copies of the records could be furnished

directly to the court, but in each instance the investigator attached to the subpoena her business card with a notation asking that the copies be mailed directly to her. Each records custodian complied with the investigator's request and mailed the copies to the investigator. As soon as she received the copies the investigator unsealed the envelopes and read the copies. She later testified that her actions were consistent with an "informal procedure" followed by investigators in the public defender's office.

The Education Code provides that (with exceptions not applicable here) "[a] school district is not authorized to permit access to pupil records to any person without written parental consent or under judicial order . . ." (Ed. Code, § 49076), and that "[i]nformation concerning a student shall be furnished in compliance with a court order. The school district shall make a reasonable effort to notify the parent and the pupil in advance of such compliance if lawfully possible within the requirements of the judicial order." (*Id.* § 49077.) It is undisputed that there was neither a court order nor parental consent for release of copies of the school records in this case.

A deputy district attorney named Fernandez had been assigned to prosecute James's client; a deputy district attorney named Titus was Fernandez's supervisor. Sometime before January 19, 1990, Fernandez and Titus became aware that the investigator had obtained and examined copies of the victims' school records.

On or shortly before January 19, the investigator mentioned to James, in the course of an apparently brief and casual conversation, that one of the victims in this case was a gifted child, or was in a gifted program at school. This may have been James's first notice that the investigator had examined the victims' records. The investigator never gave James any other information from the records.

At a trial court hearing on a discovery motion in this matter on January 19, Titus appeared for the People and a deputy public defender other than James appeared specially for the defense. Titus agreed to continue the discovery matter, but then asked "that the Court also set it over for an order to show cause why the Public Defender should not be sanctioned on this case." Titus described the procedure the investigator had followed, and asserted that "[t]his is a violation of the Court's own order, which requires such motions to be held on the motions calendar. [¶] I ask that the Court order that the Public Defender return the records, not maintain copies and that the Court impose sanctions against the Public Defender for violating the order. [¶] I am extremely upset. The parents of one of the children are here in Court. They are extremely upset. [¶] The Public Defender had records to which

they are not entitled and to which they should not have [*sic*], in violation of the education code."

The court questioned specially appearing counsel, who had no knowledge of the situation but called James at the court's request. After a recess the court recited that "if that has occurred—Apparently it has—that is in violation of, at a minimum, the rules of Court." The court ordered that any records in the possession of the public defender's office pursuant to the subpoenas be immediately delivered to the court to be held sealed pending a further hearing on the matter on January 26, 1990, a Friday.

James immediately admonished the investigator that she should not have read the records and asked her to deliver the records to the court. The investigator immediately complied. Both James and the county's public defender acknowledged that James was ultimately responsible for the investigator's actions.

On January 23, 1990, four days after the January 19 hearing and three days before the scheduled hearing on Titus's request for sanctions, Titus telephoned the newspaper's columnist. Titus and the columnist had never previously met or spoken. Titus states that he called the columnist "because I was concerned about an on-going problem involving defense attorneys obtaining the school records of minors from school districts." Titus mentioned James by name. The columnist agreed to meet Titus at Titus's office.

Fernandez attended the meeting at Titus's office; the columnist had never previously met or spoken with Fernandez. At the meeting, according to the columnist, Titus "went into more detail in that he was concerned about an ongoing problem that prosecutors were having with defense attorneys gaining access to confidential records of minors in order to assail their character, impeach their credibility on the stand, and he related this specifically to a case that was before the district attorney's office involving . . . James." Titus and Fernandez "explained to me that the law requires that the court be the first to receive and review the confidential documents. The court then decides which, if any, documents may be disclosed and admitted into evidence. [¶] Both Mr. Titus and Mr. Fernandez stated they were outraged that these documents surfaced when they did and that they were not informed that the documents were in the deputy public defender's possession."

Titus and Fernandez also told the columnist about the January 19 hearing and the anticipated hearing on January 26, and gave him the name and telephone number of the father of one of the victims. The columnist thereafter talked with the father. The columnist states that he also tried to reach James but was unable to do so.

On Thursday, January 25, the newspaper published the column of which James complains. A copy of the column is appended to this opinion. (See appen. A.) The highlights:

The column's headline is "A sad lesson in 'justice.' " The column begins: "Consider this a warning." It focuses on one victim and briefly describes her encounters with a man identified as the defendant, and the man's arrest. "And that's when the really scary part of this story starts."

The column points out that the man was a registered sex offender and that he was booked on a variety of charges and was assigned an attorney from the public defender's office. It continues: " 'I understand the judicial process and I understand what their job is,' says the girl's father. 'But I do not understand the extreme lengths they will go to.' [¶] 'They,' in this case, is Aram James, a veteran public defender. [¶] He dispatched an investigator to do whatever investigators are supposed to do to earn their paychecks." The column describes the investigator's procedure and recites that the school principal turned the records over. "He wasn't supposed to. A state law protects school records. They can only be turned over to a judge on a court order, not just a subpoena signed by any lawyer. [¶] Then they are to be sealed until the judge reviews them. [¶] And if records are requested, parents are to be notified. [¶] That's what the law says."

But "[n]obody told the principal that. Nobody told the little girl's parents anything until the public defender conceded that he had the records at a later court hearing. [¶] 'We found out by accident,' the father says. 'I am incensed.' [¶] The prosecutors found out more or less by accident, too. [¶] 'The idea is to search for ways to impeach the credibility of the victim,' says Deputy District Attorney Richard Titus, a former high school teacher who leads a seven-member team assigned to prosecute sexual assault cases. [¶] 'So they get the young witness or victim on the stand and ask things like: "Didn't you steal pencils last year? Didn't you get into trouble for fighting? Didn't you skip school? Didn't you lie to the teacher?'

"Titus is angry about this—not just this case—but what he sees as a common and sleazy tactic to ruin kids as witnesses. [¶] 'The defense asks for anything and the schools give up anything because the schools are not aware of the California Education Code protecting records,' he says. [¶] 'We are seeing case after case in which the defense goes on a fishing expedition to attack the character of the kid. And when they are attacked, kids begin to feel ashamed and embarrassed and responsible for what is going on in the courtroom.' [¶] In other words, when the legal community turns on kids, it doubles their trauma."

The column indicates that this is not "just one frustrated prosecutor's perspective"; it quotes a San Francisco attorney, who reportedly "gives legal advice to several school districts": " 'I get hassled all the time by attorneys wanting school records without going through the proper motions.' "

The column concludes:

"I haven't been able to talk to James, the public defender, about the case of the stranger and the 10-year-old girl. But I'm certain he has some explanation for apparently violating a California law in order to get to know the alleged victim better. [¶] He is scheduled to appear before [the superior court] on Friday afternoon to explain himself. [The judge] got interested after learning how James came by the files. [¶] I take this to mean the judge has taken a dim view of the defense tactics. What he says should go up on school bulletin boards around the Bay Area."

It appears that after the column was published the public defender's office took immediate steps to bring its procedures into conformity with applicable California statutes and read a conciliatory statement into the court record, and that after three hearings the trial court concluded among other things that due to "a mistake made by an investigator," without malice, the records were in fact improperly delivered to the public defender's office, but that "there is no evidence to suggest that the attorney assigned to represent the defendant, . . . James, acted improperly in any way."

A few months later James brought this action for libel.

In support of their motion for summary judgment the defendants argued (1) that James was a "public official" and therefore could not recover for libel unless he could show that the column was false and was published with "actual malice"; (2) that James could not prove the column was false; (3) that James could not prove actual malice; and (4) that in any event the publication was protected by both statutory and common law privileges broadly applicable to fair comment on matters of public interest. The defendants tendered a substantial factual showing, indexed in a lengthy "statement of undisputed material facts." (See Code Civ. Proc., § 437c, subd. (b).)

James's only factual showing in opposition to summary judgment was his own declaration, which disputed only matters essentially irrelevant to disposition of the summary judgment motion. Primarily James relied on legal arguments (1) that for relevant purposes he was not a public official but a private individual; (2) that therefore he was not required to prove that the

newspaper or its columnist had acted with malice; (3) that the record reflected triable issues as to the falsity of the defendants' statements; and, in sum, (4) that this was not an appropriate case for the "drastic measure" of summary judgment.

The trial court concluded that the essentially undisputed evidence did not establish that James was a public official, but that each statement in the column was either (1) a constitutionally protected statement of opinion, or (2) constitutionally protected "rhetorical hyperbole or imaginative expression . . . which could not reasonably be interpreted as stating facts about the plaintiff," or (3) true. On this basis the court granted the summary judgment from which James has appealed.

■ The question before us is whether the trial court, on the defendants' motion for summary judgment, properly ruled that as a matter of law the column was not libelous. ■ We review de novo the purely legal issues raised by the summary judgment motion. (*AARTS Productions, Inc. v. Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064-1065 [225 Cal.Rptr. 203].) Because the facts are essentially undisputed, we are called upon simply to reassess the legal significance of those facts.

"Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him [her] to be shunned or avoided, or which has a tendency to injure him [her] in his [her] occupation." (Civ. Code, § 45.) Because libel involves, by this definition, a "publication" or communication of the defendant's views to some third person (cf. 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 476, pp. 560-561), the state's implementation of a plaintiff's lawsuit for damages for the libel will necessarily implicate, to greater or lesser degree, the defendant's constitutional right of freedom of expression under the First Amendment. (Cf. *Philadelphia Newspapers, Inc.* v. *Hepps* (1986) 475 U.S. 767, 775 [89 L.Ed.2d 783, 791-792, 106 S.Ct.1558]; *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 256, 265 [11 L.Ed.2d 686, 692-693, 697-698, 84 S.Ct. 710, 95 A.L.R.2d 1412].)

The clearest case for constitutional protection of an allegedly libelous publication is one in which the plaintiff is a public official or public figure, the defendant is a representative of the media of mass communication, and the publication relates to a matter of public interest or concern. (Cf. *Philadelphia Newspapers, Inc.* v. *Hepps, supra,* 475 U.S. 767, 775 [89 L.Ed.2d 783, 791-792]; *New York Times Co.* v. *Sullivan, supra,* 376 U.S. 254, 279-280 [11 L.Ed.2d 686, 706-707]; *Curtis Publishing Co.* v. *Butts* (1967)

388 U.S. 130, 152-155, 162 (conc. opn. of Warren, C. J.) [18 L.Ed.2d 1094, 1109-1111, 1115, 87 S.Ct. 1975].)

■ In the trial court the defendants took the position that James was a public official, and that as such he could not recover for any arguable libel "unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." (*New York Times Co.* v. *Sullivan, supra,* 376 U.S. 254, 279-280 [11 L.Ed.2d 686, 706].) The trial court concluded from the undisputed facts that James was *not* a public official. In this court the defendants argue that the trial court's conclusion was incorrect; relying on *Tague* v. *Citizens for Law & Order, Inc.* (1977) 75 Cal.App.3d Supp. 16 [142 L.Ed.2d 689], they argue that as a deputy public defender James was indeed a public official.

With all respect to counsel for the defendants and to the judges who wrote the thoughtful opinion in *Tague,* we disagree with their analysis and sustain the trial court's conclusion that James was not a public official.

■ We agree with another Court of Appeal's reading of the United States Supreme Court cases: "[T]he [United States] Supreme Court's vision of a 'public official' is someone in the government's employ who: (1) has, or appears to the public to have, substantial responsibility for or control over the conduct of governmental affairs; (2) usually enjoys significantly greater access to the mass media and therefore a more realistic opportunity to contradict false statements than the private individual; (3) holds a position in government which has such apparent importance that the public has an independent interest in the person's qualifications and performance beyond the general public interest in the qualifications and performance of all government employees; and (4) holds a position which invites public scrutiny and discussion of the person holding it entirely apart from the scrutiny and discussion occasioned by the particular controversy." (*Mosesian* v. *McClatchy Newspapers* (1988) 205 Cal.App.3d 597, 608-609 [256 Cal.Rptr. 256]; cf. *Rosenblatt* v. *Baer* (1966) 383 U.S. 75, 85-87 [15 L.Ed.2d 597, 605-606, 86 S.Ct. 669]; *Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 344 [41 L.Ed.2d 789, 807-808, 994 S.Ct. 2997].) Elements of public visibility and official power recently persuaded a Court of Appeal to hold that a child welfare worker was a public official (*Kahn* v. *Bower* (1991) 232 Cal.App.3d 1599, 1610-1613 [284 Cal.Rptr. 244]); it was the lack of an element of control that earlier led another division of the same Court of Appeal to conclude that a public high school teacher was *not* a public official. (*Franklin* v. *Benevolent etc. Order of Elks* (1979) 97 Cal.App.3d 915, 922-925 [159 Cal.Rptr. 131].)

In *Tague* the appellate department concluded that because an assistant public defender was charged with discharging the government's constitutional duty to provide representation to indigent defendants, had discretionary control over pretrial, trial, and posttrial matters in felony cases, and was involved in "the subject of crime and criminals . . . [which] plunges deeply into the heart of public concern," he met the United States Supreme Court's criteria for a public official. (*Tague* v. *Citizens for Law & Order, Inc., supra,* 75 Cal.App.3d Supp. 16, 23-24.)

We respectfully disagree with *Tague*. From a practical perspective a deputy public defender in the discharge of his or her duties differs from a private criminal defense attorney only in the happenstance of his or her employment. Such control as he or she may exercise over the management of a particular case must invariably be controlled in turn by considerations of the best interests of the individual client, tempered only by professional constraints applicable to all attorneys and not by any generalized public interest beyond the concern that indigent defendants should be competently and professionally represented. It would be a gross overstatement to say that a deputy public defender has, or would appear to the public to have, "substantial responsibility for or control over the conduct of governmental affairs." (*Mosesian* v. *McClatchy Newspapers, supra,* 205 Cal.App.3d at p. 608.)

It is clear, however, that James's performance, and administration of the criminal laws in general and laws relating to child molestation in particular, were matters of legitimate public interest and concern. Therefore, the qualified constitutional protections applicable to publications by media defendants, about private plaintiffs, on matters of public interest or public concern apply to this case. (Cf. *Milkovich* v. *Lorain Journal Co.* (1990) 497 U.S. 1, 15-21 [111 L.Ed.2d 1, 15-19, 110 S.Ct. 2695]; *Philadelphia Newspapers, Inc.* v. *Hepps, supra,* 475 U.S. 767, 775, 776-778 [89 L.Ed.2d 783, 791-792, 792-794].) These considerations, as the United States Supreme Court has put it, "reshape the common-law landscape to conform to the First Amendment. . . . When the speech is of public concern but the plaintiff is a private figure . . . , the Constitution still supplants the standards of the common law, but the constitutional requirements are, in at least some of their range, less forbidding than when the plaintiff is a public figure and the speech is of public concern." (*Philadelphia Newspapers, Inc.* v. *Hepps, supra,* 475 U.S. at p. 775 [89 L.Ed.2d at pp. 791-792].) We shall incorporate the constitutional requirements into our analysis.

James complains that the trial court improperly "broke the [column] into disparate parts" rather than considering it as a whole. His position is that,

regardless of the defamatory significance of "bits and pieces standing alone," the column as a whole falsely states or connotes that he violated or purposely evaded the law, that he violated professional ethics, and that the judge disapproved of his tactics.

James's legal premise is sound. ■ " ' "[I]f the defendant juxtaposes [a] series of facts so as to imply a defamatory connection between them, or [otherwise] creates a defamatory implication . . . he [she] may be held responsible for the defamatory implication, . . . even though the particular facts are correct." [Citation.]' [Citation.] Therefore, 'it is the defamatory *implication*—not the underlying assertions giving rise to the implication—which must be examined to discern whether the statements are entitled to full constitutional protection.' " (*Weller* v. *American Broadcasting Companies, Inc.* (1991) 232 Cal.App.3d 991, 1003, fn. 10 [283 Cal.Rptr. 644]; cf. also *Selleck* v. *Globe International, Inc.* (1985) 166 Cal.App.3d 1123, 1131 [212 Cal.Rptr. 838].)

Because we review the issues de novo we need not determine whether the trial court's approach was analytically proper. As the defendants point out, consideration of the whole rationally begins with consideration of the parts. And in this court, as in the trial court, James has himself focused attention on the parts by asserting, alternatively, that defamation may be found in the whole *or* in a part of a publication. We shall consider both the parts and the whole of the defendants' column.

Preliminarily viewed as a whole, the column undeniably impugned James's professional reputation. It suggested, very broadly, that at least in the *opinions* of Titus, of the victim's father, and of the columnist James is a member of a class of lawyers that engages in, and his conduct in this instance is an example of, sleazy, illegal, and unethical practice against which the public should be warned.

■ But as libel law has evolved, courts have come to the view that pure statements of *opinion* should not be actionable. The classic statement in the constitutional context was provided by the United States Supreme Court: "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues. [Citation.]" (*Gertz* v. *Robert Welch, Inc.*, *supra*, 418 U.S. 323, 339-340 [41 L.Ed.2d 789, 805], fn. omitted; cf. *Good Government Group of Seal Beach, Inc.* v. *Superior*

*Court* (1978) 22 Cal.3d 672, 680 [150 Cal.Rptr. 258, 586 P.2d 572].) ▮ The pertinent question on the defendants' motion for summary judgment, here as in the trial court, is whether a reasonable fact finder could conclude that the publication as a whole, or any of its parts, directly made or sufficiently implied a false assertion of defamatory *fact* that tended to injure James's reputation. If such a fact finder could so conclude, then summary judgment was inappropriate. But if not, then the judgment should be affirmed.

There will not invariably be a bright line between protected statements of opinion and actionable statements of fact. ▮ In the close case, whether a statement is opinion or fact will be an issue of law for the court to decide. (Cf. *Weller* v. *American Broadcasting Companies, Inc., supra,* 232 Cal.App.3d 991, 1002, fn. 9.) In *Milkovich* v. *Lorain Journal Co., supra,* 497 U.S. 1, the United States Supreme Court denied that its classic statement "was intended to create a wholesale defamation exemption for anything that might be labeled 'opinion.' . . . Not only would such an interpretation be contrary to the tenor and context of the passage, but it would also ignore the fact that expressions of 'opinion' may often imply an assertion of objective fact." (*Milkovich* v. *Lorain Journal Co., supra,* 497 U.S. at p. 18 [111 L.Ed.2d at p. 17].) ▮ Nevertheless, in recognition of the importance of constitutional protection for statements of opinion, *Milkovich* endorsed two tests to be applied to an assertedly defamatory statement that might on its face be either fact or opinion:

First, "a statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least in situations . . . where a media defendant is involved. . . . [A] statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." (*Milkovich* v. *Lorain Journal Co., supra,* 497 U.S. at pp. 19-20 [111 L.Ed.2d at p. 18], fns. omitted.)

Second, there is also constitutional protection "for statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual. [Citation.] This provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation. [Citation.]" (*Milkovich* v. *Lorain Journal Co., supra,* 497 U.S. at p. 20 [111 L.Ed.2d at p. 19].)

▮ Viewed as a whole, the column before us appears to address three distinct topics: The conduct of the criminal defense bar generally with respect to child victims or child witnesses; James's conduct on this occasion;

and the failure of schools to comply, and to insist on compliance, with laws for protection of pupils' records. James's concern, and ours, will be limited to statements directly or indirectly relevant to his reputation. These statements can be divided into four categories, of which the first three present no real difficulties of classification.

(1) The column contains a core of plainly factual statements about James: He was "a veteran public defender"; he was assigned to represent the defendant; he signed a subpoena for "everything the school had on the little girl"; he dispatched an investigator who delivered the subpoena to the child victim's elementary school; in violation of law the school principal turned the records over to the investigator without a court order and without notifying the child's parents, and thus James "came by" the records; James "apparently [violated] a California law in order to get to know the alleged victim better"; James was scheduled to appear before a judge to "explain himself."

(2) The column also contains essentially factual statements, all attributed to Titus, about the class of criminal defense attorneys of which James was a member: Their motive " 'is to search for ways to impeach the credibility of the victim' "; " 'they get the young witness or victim on the stand and ask things like: "Didn't you steal pencils last year? Didn't you get into trouble for fighting? Didn't you skip school? Didn't you lie to the teacher?" ' "; they " 'ask[ ] for anything and the schools give up anything because the schools are not aware of the California Education Code protecting records' "; " 'when [child victims] are attacked [on cross examination], kids begin to feel ashamed and embarrassed and responsible for what is going on in the courtroom.' "

(3) Certain of the column's statements fall into *Milkovich*'s protected zone of " 'imaginative expression' " or " 'rhetorical hyperbole' ": James's acquisition of the records was a "really scary part of this story"; in the father's view James went to " 'extreme lengths' "; in Titus's view the defense practice he described and criticized was "a common and sleazy tactic to ruin kids as witnesses" that made him "angry"; Titus is " 'seeing case after case in which the defense goes on a fishing expedition to attack the character of the kid' "; taken as a whole the column was "[a] sad lesson in 'justice' "; the columnist wanted readers to "[c]onsider" his column a "warning." Each of these statements is clearly recognizable as opinion and could not reasonably be understood as a statement of literal fact. James calls to our attention a Missouri case, *Anton* v. *St. Louis Suburban Newspapers, Inc.* (Mo.Ct.App. 1980) 598 S.W.2d 493, 497, 499, in which the Court of Appeals concluded that a newspaper's statement that " '[t]his sleazy sleight-of-hand has been

the work of" the attorney plaintiff, was a libel per se but that the statement was constitutionally privileged because it was an opinion. We reach the same ultimate result, for the same reason, by a slightly different analytic route dictated by the intervening *Milkovich* decision.

(4) The remaining statements arguably relevant to James fall somewhere between fact and hyperbole: "[W]hen the legal community turns on kids, it doubles their trauma"; a school law specialist " 'get[s] hassled all the time by attorneys wanting school records without going through the proper motions' "; the columnist "take[s]" the pendency of proceedings for James before a judge "to mean the judge has taken a dim view of the defense tactics." To determine whether these statements should be regarded as fact or as opinion we rely on *Milkovich*'s first test: Do the statements contain *provably false* factual connotation?

We conclude that none of the three statements in the fourth category is provably false, and therefore that none of them can be regarded as factual for purposes of libel analysis in the circumstances of this case.

The statements that "when the legal community turns on kids, it doubles their trauma," and that counsel " 'get[s] hassled all the time by attorneys wanting school records without going through the proper motions,' " contain too many generalizations, elastic terms, and elements of subjectivity to be susceptible of proof or disproof. When does the "legal community" "turn on" "kids"? What is "trauma" in this context, and how can its increments be measured? What does "hassled" mean? What are "the proper motions," and what is the implication of the fact attorneys do not want to go through them: Beyond "hassling," are we to understand that these attorneys would simply take the records without going through the proper motions?

The columnist's perception that "the judge has taken a dim view of the defense tactics" is plainly labeled as opinion but arguably implies that the judge has indeed taken "a dim view." But what is a "dim view"? In common parlance it means disapproval or dissatisfaction. But how much or how little of either would suffice to connote a "dim view"? These matters, again, are not susceptible of proof or disproof.

We next reach the question whether those statements which we have found to be both potentially relevant to James's reputation and *factual* are *false*. It has been suggested that "whether the statements were *actually* true or false" is "a question of fact for trial." (*Moyer* v. *Amador Valley J. Union High School Dist.* (1990) 225 Cal.App.3d 720, 725, fn. 2 [275 Cal.Rptr. 494].) But of course a question of fact may become, for purposes of

summary judgment, a question of law if the fact is undisputed. There is no significant dispute in the facts of record here.

The record establishes that most of the statements we have identified are either true or at least not so clearly and unequivocally false as to be actionable:

James is a "veteran public defender."

He was assigned to represent the defendant.

Criminal defense attorneys do "search for ways to impeach the credibility of the victim."

Although James did not himself sign the subpoena, inferably he authorized the investigator to sign his name; we regard the distinction as immaterial.

The subpoena was for all of the child's school records.

James did authorize the investigator to serve the subpoena, and the investigator did so.

The principal did turn the records over to the investigator without complying, or requiring compliance, with applicable statutes.

Although it appears that James personally never saw the records and in this sense never "came by" them, it is true that the records were delivered to the public defender's office and were examined by James's investigator; again the distinction is immaterial.

James was scheduled to appear before a judge to "explain himself."

It was also shown in substance, and without dispute, that a child victim whose credibility is attacked in court does feel ashamed, embarrassed, and that "he or she has done something else wrong . . . ."

The column's statement, attributed to Titus, that the defense " 'asks for anything and the schools give up anything because the schools are not aware of the California Education Code protecting records' " is neither proved nor disproved in the record before us. We regard the statement as essentially cumulative of others in the column and attach no dispositive significance to the lack of proof.

Two statements remain: That James "apparently [violated] a California law in order to get to know the alleged victim better," and that defense

counsel " 'get the young witness or victim on the stand and ask things like: "Didn't you steal pencils last year? Didn't you get into trouble for fighting? Didn't you skip school? Didn't you lie to the teacher?" ' " The implication of the second statement is that most of the questions counsel are apt to ask are irrelevant and calculated to harass, and that it was this kind of line of questioning that James had in mind when he sought the victim's records.

James would deny both statements.

As to the first, his position is that *he* did not violate the law, and that any violation attributable to the public defender's office must be considered the responsibility of the investigator. Although the position may be sound as a narrow matter of semantics we find it legally and philosophically unpersuasive: Ample undisputed evidence supports the conclusion that James was in charge of his client's defense and that to the extent he asked an investigator to assist in that defense he guided, and should be required to assume responsibility for, the investigator's activities. Such evidence as the record contains suggests (again without dispute) that there was a practice among public defender's investigators to obtain records of this kind exactly as this investigator did; there is no support for an inference that the investigator stepped so far out of line as to release James from all responsibility for her actions. The short of it is that James's defense team, if not James himself, did encourage the principal to violate the Education Code by turning over records without either parental consent or a court order. Piercing through semantic hypertechnicality, we conclude the column's statement is essentially true and therefore will not support an action for libel.

In deposition James essentially denied that he would make use of information in a child victim's records for anything beyond legitimate presentation of matters relevant to credibility or other disputed issues. James's posture may be taken to be that if it is to be inferred that he would act in accordance with the asserted practice of defense attorneys generally to ask questions designed primarily to harass child victims, then as to him the inference is false.

As a matter of law we will not permit a libel action to depend on so tenuous a thread. We would agree with James that most of the questions Titus (and, by incorporation, the columnist) hypothesized would be irrelevant to credibility (or any other issue) and therefore impermissible, but it is by no means clear to us that even a direct false accusation of use of impermissible questions on cross-examination would be so necessarily injurious to a trial attorney's reputation as to be an actionable libel. In any event, when the column was published James had not yet gone to trial, and we are unwilling to read the quotation of Titus's views as to what defense counsel generally do as an actionable assertion that that was what James would do,

or even that that was what he intended when he directed that the records be subpoenaed.

We thus conclude as a matter of law that none of the *parts* of the column were libelous. We last address James's premise that, for purposes of libel analysis, the whole of a publication may be greater than the sum of its parts: That statements that do not defame a plaintiff when considered individually may be combined in such a way as to imply one or more actionable false statements of fact injurious to the plaintiff's reputation.

James argues that "the gist, sting, or reasonable interpretation" of the column is that James "is a veteran public defender who conducted himself in a grossly unethical manner while defending a child molester. The unethical conduct involved issuing an illegal subpoena, pursuing a 'sleazy tactic to ruin kids as witnesses', purposely evading the requirements of law, and a judge has disapproved of his tactics." Thus, James argues, the column as a whole makes or implies four false factual statements: "(a) JAMES violated the law[;] [¶] (b) JAMES' specific actions were in violation of professional ethics for attorneys[;] [¶] (c) JAMES purposely evaded the requirements of the law[; and] [¶] (d) [a] judge had disapproved JAMES'[s] tactics . . . ."

We must ask, first, whether a reasonable fact finder could so construe the column as a whole, and, second, whether the column as a whole, construed as James proposes or in any event as strongly as reasonably possible in support of James's position, implied one or more actionable libels. As to the first question we agree with James that the critical determination will be "the natural and probable effect" of the column considered as a whole "upon the mind of the average reader" rather than "its effect when subjected to the critical analysis of a mind trained in the law . . . ." (*MacLeod* v. *Tribune Publishing Co.* (1959) 52 Cal.2d 536, 547 [343 P.2d 36]; cf. *Edwards* v. *Hall* (1991) 234 Cal.App.3d 886, 903, fn. 14 [285 Cal.Rptr. 810].) But James's representation that at trial he would be able to present testimony of an expert linguist to establish "the impact of such defamatory statements on an average reader" is irrelevant to the issues before us: Although at trial of an appropriate case such testimony need not be excluded (cf. *Weller* v. *American Broadcasting Companies, Inc., supra,* 232 Cal.App.3d 991, 1007-1009), we find in the record before us no indication either that expert testimony would have been necessary or helpful in this instance or that such testimony, or its availability, was made known to the trial court before it ruled. It appears that James did not produce or refer to the testimony until he moved for reconsideration after the summary judgment motion was granted.

We do not believe a reasonable fact finder would support James's position as strongly as he has. In our view such a fact finder would construe the column as a whole as a statement in relevant part (1) that James, or persons

acting at his direction, had encouraged the school principal to release the school records illegally for the ultimate benefit of James's client, (2) that the columnist believed James had thus violated the law himself, (3) that the columnist agreed with Titus that James had been guilty of a "sleazy" (and thus inferably unethical) tactic, common (in Titus's view) among criminal defense attorneys, "to ruin kids as witnesses," and (4) that the columnist believed the judge believed, pending a further hearing, that James had acted improperly. We do not agree with James that a reasonable fact finder would conclude that James had been (or that the columnist believed James had been) "grossly" unethical, or that James's actions were (or that the columnist believed they were) in violation of anything so specific as "professional ethics for attorneys."

To our construction of the column as a whole we apply essentially the same rules we applied to its parts: Truth is not actionable. Pure opinion is not actionable. Where, as here, media defendants are sued for a publication on matters of public interest or public concern, close questions as to whether statements are fact or opinion must be resolved in light of the *Milkovich* tests.

Upon application of these rules we find only one potentially actionable statement of fact implicit in the column as a whole: That James, or persons acting at his direction, had encouraged the school principal to release the school records illegally for the ultimate benefit of James's client. The perception that the trial judge suspected that, and had scheduled a hearing to determine whether, James had acted improperly adds nothing of substance to this statement. The remaining implications of the column must, for reasons we have discussed at length, be treated as protected statements of opinion.

The one implicit statement of fact is, as we have pointed out, essentially true, and therefore it is not libelous.

In sum, because on the essentially undisputed facts a reasonable fact finder could have found explicit or implicit in the column no false statement of fact which exposed James to hatred, contempt, ridicule, or obloquy, or which caused him to be shunned or avoided, or which had a tendency to injure him in his occupation, the defense summary judgment was properly granted.

The judgment is affirmed. The defendants shall recover their costs on appeal.

Cottle, P. J., and Wunderlich, J., concurred.

*Thursday morning, January 25, 1990*

# A sad lesson in 'justice'

By Pat Dillon

**C**ONSIDER THIS a warning.

On a Sunday afternoon last year, a 10-year-old Santa Clara girl was riding her bicycle on a neighborhood school playground, when she was approached by a stranger.

The girl remembers the stranger saying: "That bicycle does not belong to you. That bicycle was stolen. You come with me to the office right now."

A stranger, yes, but a stranger apparently of some authority.

Sometimes, child molesters even dress up in uniforms.

The stranger and the little girl took a short walk toward the office. He demanded to know her name, her parents' names, her address, when her parents would be home. And then, before they reached the office, he let her go.

At 7 the next morning, the stranger appeared at her door. He knocked. Then he tried the door.

But the little girl was not alone. She had told her mom about the encounter the previous day. The cops busted the stranger.

And that's when the really scary part of this story starts.

The stranger, it turns out, is a registered sex offender. He was booked into jail on a variety of charges -- kidnapping, attempted burglary, attempted child molestation -- and pretty soon he was assigned an attorney from the Santa Clara County Public Defender's Office.

"I understand the judicial process and I understand what their job is," says the girl's father. "But I do not understand the extreme lengths they will go to."

**'T**HEY," IN THIS case, is Aram James, a veteran public defender. He dispatched an investigator to do whatever investigators are supposed to do to earn their paychecks.

The investigator delivered a subpoena, signed by James, to the 10-year-old girl's elementary school. The subpoena demanded any and all records -- health, discipline, academics -- everything the school had on the little girl.

The principal turned them over.

He wasn't supposed to. A state law protects school records. They can only be turned over to a judge on a court order, not just a subpoena signed by any lawyer.

Then they are to be sealed until the judge reviews them.

And if records are requested, parents are to be notified.

That's what the law says.

Nobody told the principal that. Nobody told the little girl's parents anything until the public defender conceded that he had the records at a later court hearing.

"We found out by accident," the father says. "I am incensed."

The prosecutors found out more or less by accident, too.

"The idea is to search for ways to impeach the credibility of the victim," says Deputy District Attorney Richard Titus, a former high school teacher who leads a seven-member team assigned to prosecute sexual assault cases.

"So they get the young witness or victim on the stand and ask things like: 'Didn't you steal pencils last year? Didn't you get into trouble for fighting? Didn't you skip school? Didn't you lie to the teacher?' "

**T**ITUS IS ANGRY about this -- not just this case -- but what he sees as a common and sleazy tactic to ruin kids as witnesses.

" 'The defense asks for anything and the schools give up anything because the schools are not aware of the California Education Code protecting records," he says.

"We are seeing case after case in which the defense goes on a fishing expedition to attack the character of the kid. And when they are attacked, kids begin to feel ashamed and embarrassed and responsible for what is going on in the courtroom."

In other words, when the legal community turns on kids, it doubles their trauma.

So, is this just one frustrated prosecutor's perspective?

No.

Margaret O'Donnell, a San Francisco attorney who gives legal advice to several school districts, including Palo Alto, Mount Diablo and San Jose Unified, says, "I get hassled all the time by attorneys wanting school records without going through the proper motions."

I haven't been able to talk to James, the public defender, about the case of the stranger and the 10-year-old girl. But I'm certain he had some explanation for apparently violating a California law in order to get to know the alleged victim better.

He is scheduled to appear before Superior Court Judge Kevin Murphy on Friday afternoon to explain himself. Murphy got interested after learning how James came by the files.

I take this to mean the judge has taken a dim view of the defense tactics. What he says should go up on school bulletin boards around the Bay Area.

*Write Pat Dillon at 750 Ridder Park Drive, San Jose 95190 or call (408) 920-5717.*