[No. B125980. Second Dist., Div. Two. Sept. 20, 1999.]

THOMAS M. FERLAUTO, Plaintiff and Appellant, v.
JANE HAMSHER et al., Defendants and Respondents.

## Counsel

Thomas M. Ferlauto, in pro. per., for Plaintiff and Appellant.

Sidley & Austin, Stephen G. Contopulos and Bradley H. Ellis for Defendants and Respondents.

## Opinion

**BOREN, P. J.**—Appellant, Attorney Thomas M. Ferlauto, sued respondents, Jane Hamsher, Don Murphy, Jane and Don Productions, Inc., and Broadway Books, for defamation and intentional and negligent infliction of emotional distress. The trial court sustained without leave to amend the demurrer to Ferlauto's second amended complaint. We affirm.

### Factual and Procedural History

Ferlauto sued because of unflattering comments impliedly referring to him in Hamsher's book entitled Killer Instinct: How Two Young Producers Took on Hollywood and Made the Most Controversial Film of the Decade (1997) (hereinafter, the book).[1] The book concerned the making of the movie NATURAL BORN KILLERS (1994), which was produced by Hamsher and Murphy, "written by" Quentin Tarantino, and directed by Oliver Stone. The book discussed, in part, litigation that resulted when Rand Vossler, briefly slotted to be the director of the movie, sued Hamsher and Murphy for fraud after they asked him to step aside. Vossler was represented by Attorney Ferlauto, and a confidential settlement agreement was ultimately reached. In her book, Hamsher made critical remarks about the litigation and about the attorney for Vossler, though the name of the attorney was never mentioned.

---

[1]Pursuant to respondents' request, we have taken judicial notice of the book, copies of which have been lodged with this court.

Hamsher's book is laden with flip, earthy and colorful language, and written in an exaggerated, irreverent and attention-grabbing style. The jacket of the book advises the reader that it is "[a] shockingly candid, hilarious account" of the producer's "two-year roller-coaster ride through the ruthless world of studio pitbulls, idiotic film crew leeches, and unprecedented butt-kissing and back-stabbing." Book reviews quoted on the book jacket characterize the book as "lean, mean, scabrously honest," and as "[f]ast, funny and horrifically honest . . . . Hamsher delivers the most mercilessly incisive portrait of our prepsychotic film industry in years."

Nothing in the book specifically states that Ferlauto in his legal representation of Vossler was incompetent or unethical, but Ferlauto alleged in his complaint that those were reasonable implications from various statements culled from the book. The statements complained of concerned negative remarks about the Vossler lawsuit and several imaginative and vigorous insults.

 The comments, taken out of context and listed seriatim much as Ferlauto did in his complaint, were as follows: (1) "I [Hamsher] screamed, 'If some whore's son is filing a motion just to make me pay to defend it, even though it's preposterous, he should be forced to pay if he's found full of shit!' ";[2] (2) filing the motion was "stupid"; (3) the judge "laughed at their motion"; (4) "the judge thought their motion was a joke"; (5) "the judge had laughed his case out of court during the summary judgment"; (6) " 'a judge threw out their summary motion as spurious' "; (7) " 'It's clearly a frivolous lawsuit' "; (8) " 'Rand's lawsuit is spurious' "; (9) "not an ethical one"; (10) "Kmart Johnnie Cochran"; (11) "loser wannabe lawyer"; (12) " 'creepazoid attorney' "; (13) "little fucker"; and (14) "meanest, greediest, low-blowing motherfuckers." Ferlauto alleged in the complaint that such statements implied that he is an unethical attorney who abuses legal procedures to vex, harass and annoy his opponents, and that such statements were defamatory on their face and actionable per se in that they tended to injure him in his profession without the necessity of considering the surrounding circumstances.

Ferlauto's second amended complaint also alleged that litigation in which he had represented Vossler was resolved with a confidential settlement agreement. According to the terms of the agreement, Hamsher, Murphy and their production company each agreed "to maintain the confidentiality of . . . the nature of the claims asserted in the [Vossler] Lawsuit or any other matter," and further agreed "not to use or disclose any document, tape

---

[2]Appellant's motion for a preliminary injunction had been denied because he had not pled a cause of action requesting injunctive relief.

recording, or other matter of any description whatsoever occasioned by, or arising out of [the Vossler] Lawsuit. . . ."[3] Ferlauto urges that by entering into this agreement, respondents "waived their Constitutional right of free speech guaranteed by the First Amendment with respect to all communications concerning the [Vossler] Lawsuit."[4]

The trial court sustained the demurrer to Ferlauto's second amended complaint without leave to amend. The court held that the First Amendment barred the libel cause of action because "the alleged defamatory statements would not imply to a reasonable fact-finder provable false factual assertions," and that likewise the claims for emotional distress could not be sustained.

## DISCUSSION

### I. *No waiver of the First Amendment as a defense*

Ferlauto contends that respondents cannot assert the First Amendment as a defense to his claims because they knowingly and voluntarily waived those rights by entering into a confidentiality agreement in the Vossler litigation. According to Ferlauto, without the protection of the First Amendment, this court should apply the common law of defamation as it existed prior to *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254 [84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R.2d 1412], and that by applying the law of defamation without the protections of the First Amendment all of the statements alleged in the second amended complaint are actionable. (See *Milkovich* v. *Lorain Journal Co.* (1990) 497 U.S. 1, 12-21 [110 S.Ct. 2695, 2702-2707, 111 L.Ed.2d 1][describing the history of First Amendment protections restricting the state law of defamation].)

Apart from Ferlauto's analysis of defamation law unencumbered by the First Amendment, his underlying premise is flawed. There was no waiver of the First Amendment by the terms of the confidentiality agreement at issue here.

The First Amendment "safeguards a freedom which is the 'matrix, the indispensable condition, of nearly every other form of freedom.' [Citation.] Where the ultimate effect of sustaining a claim of waiver might be an imposition on that valued freedom, we are unwilling to find waiver in

---

[3]Pursuant to respondents' request, we have also taken judicial notice of the mutual limited release among the parties, dated May 28, 1998, which establishes that Ferlauto may not amend his complaint to state a cause of action against respondents for breach of contract as to the Vossler confidential settlement agreement.

[4]We note that respondent Broadway Books was not a party to this settlement agreement.

circumstances which fall short of being clear and compelling." (*Curtis Publishing Co.* v. *Butts* (1967) 388 U.S. 130, 145 [87 S.Ct. 1975, 1986, 18 L.Ed.2d 1094].) " '[I]t is well established that courts closely scrutinize waivers of constitutional rights, and "indulge every reasonable presumption against a waiver." ' " (*City of Glendale* v. *George* (1989) 208 Cal.App.3d 1394, 1398 [256 Cal.Rptr. 742] [record fails to establish understanding waiver of First Amendment rights by a consent judgment].)

■■■ The agreement here alleged to result in a waiver of fundamental First Amendment rights binds the parties to confidentiality as to "the nature of the claims asserted in the [Vossler] Lawsuit or any other matter," and an understanding "not to use or disclose any document, tape recording, or other matter of any description whatsoever occasioned by, or arising out of [the Vossler] Lawsuit."[5] The confidentiality clause does not by its terms specifically prohibit characterizations of the legal abilities or the personality of Attorney Ferlauto. Indicative of the absence of any intent to shield Ferlauto from anyone's First Amendment speech, the second amended complaint does not assert Ferlauto was a party to the confidentiality agreement or even mentioned in the terms of the agreement. Indeed, it would be unusual for the typical confidential settlement agreement to protect counsel, rather than the litigants and the terms of their agreement.

Moreover, the phrase "the nature of the claims asserted . . . or any other matter," is so imprecise and overbroad as to "fall short of being [a] clear and compelling" (*Curtis Publishing Co.* v. *Butts, supra,* 388 U.S. at p. 145 [87 S.Ct. at p. 1986]) waiver of specific First Amendment rights regarding any comments about Ferlauto. It is uncertain whether the phrase "nature of the claims asserted" applies only to preclude revelation of the causes of action in the complaint, or is intended to prohibit any general discussion of the claims. And, the vague phrase "any other matter," without any point of reference, is hopelessly imprecise and overbroad. Such language is an inadequate basis for a knowing and intelligent waiver of the constitutional right to freedom of speech. (See *National Polymer Products* v. *Borg-Warner Corp.* (6th Cir. 1981) 641 F.2d 418, 423-424 [terms of a protective order to preserve confidentiality of discovery material were deemed ambiguous and not a waiver of First Amendment rights].)

Accordingly, respondents have not waived the right to rely on the First Amendment in defense of appellant's claims.

---

[5]Ferlauto has not alleged that respondents used or disclosed any document, tape recording, or specific physical item.

## II. *Appellant cannot state a libel claim because none of the statements cited from the book convey a provably false factual assertion*

■ To state a libel claim which is not defeated by the freedom of speech protections of the First Amendment, Ferlauto must allege a statement that is provably false. (*Milkovich* v. *Lorain Journal Co., supra,* 497 U.S. at p. 20 [110 S.Ct. at p. 2706].) Statements do not imply a provably false factual assertion and thus cannot form the basis of a defamation action if they cannot " 'reasonably [be] interpreted as stating actual facts' about an individual." (*Ibid.,* citing *Hustler Magazine* v. *Falwell* (1988) 485 U.S. 46, 50 [108 S.Ct. 876, 879, 99 L.Ed.2d 41].) Thus, "rhetorical hyperbole," "vigorous epithet[s]," "lusty and imaginative expression[s] of . . . contempt," and language used "in a loose, figurative sense" have all been accorded constitutional protection. (*Greenbelt Pub. Assn.* v. *Bresler* (1970) 398 U.S. 6, 14 [90 S.Ct. 1537, 1542, 26 L.Ed.2d 6]; *Letter Carriers* v. *Austin* (1974) 418 U.S. 264, 284, 286 [94 S.Ct. 2770, 2781, 2782, 41 L.Ed.2d 745].)

"The critical determination of whether an allegedly defamatory statement constitutes fact or opinion is a question of law for the court [citations] and therefore suitable for resolution by demurrer. [Citation.] If the court concludes the statement could reasonably be construed as either fact or opinion, the issue should be resolved by a jury. (*Good Government Group of Seal Beach, Inc.* v. *Superior Court* (1978) 22 Cal.3d 672, 680 . . . .)" (*Campanelli* v. *Regents of University of California* (1996) 44 Cal.App.4th 572, 578 [51 Cal.Rptr.2d 891].) In drawing the distinction between opinion and fact, California courts apply the totality of the circumstances test to determine whether an allegedly defamatory statement is actionable. (*Baker* v. *Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260 [228 Cal.Rptr. 206, 721 P.2d 87].)

■ In applying the totality of the circumstances test, " 'editorial context is regarded by the courts as a powerful element in construing as opinion what might otherwise be deemed fact.' " (*Morningstar, Inc.* v. *Superior Court* (1994) 23 Cal.App.4th 676, 693 [29 Cal.Rptr.2d 547].) In evaluating whether language used is defamatory, courts look " 'not so much [to the allegedly libelous statement's] effect when subjected to the critical analysis of a mind trained in the law, but [to] the natural and probable effect upon the mind of the average reader.' " (*Id.* at p. 688.)

Part of the totality of the circumstances used in evaluating the language in question is whether the statements were made by participants in an adversarial setting. "[W]here potentially defamatory statements are published in a . . . setting in which the audience may anticipate efforts by the parties to

persuade others to their positions by use of epithets, fiery rhetoric or hyperbole, language which generally might be considered as statements of fact may well assume the character of statements of opinion." (*Gregory* v. *McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 601 [131 Cal.Rptr. 641, 552 P.2d 425] [statements in a bulletin attacking the motives of union officers in a labor dispute].) " '[S]ince such [labor] disputes, realistically considered, normally involve considerable differences of opinion and vehement adherence to one side or the other, a necessarily broad area of discussion without civil responsibility in damages is an indispensable concomitant of the controversy.' " (*Id.* at p. 602; see also *Information Control* v. *Genesis One Computer Corp.* (9th Cir. 1980) 611 F.2d 781, 784 [disparaging comments by business litigants generally understood not as statements of fact but as predictable opinion of the other side's motives].)

In *Partington* v. *Bugliosi* (9th Cir. 1995) 56 F.3d 1147, the court discussed critical comments made in Attorney Vincent Bugliosi's book about another attorney's unsuccessful representation of a defendant in a murder case, in which Bugliosi had obtained an acquittal for the codefendant in a separate trial. With personal accounts by a commentator who was a participant involved in the litigation, "a reader would be likely to recognize that the critiques of the judges, witnesses, and other participants in the [litigation]— and particularly of the other counsel—generally represent the highly subjective opinions of the author rather than assertions of verifiable, objective facts." (*Id.* at p. 1154.) Although Bugliosi had clearly implied that Attorney Partington had inadequately represented his client (*id.* at p. 1157), "[c]ritiques of a lawyer's performance in a particular case generally cannot be proved true or false and, consequently, cannot ordinarily serve as the basis of a defamation claim. . . . [¶] . . . [¶] . . . [C]ourts should be reluctant to hold comments concerning the professional abilities of an individual actionable." (*Id.* at pp. 1158-1159; see also *James* v. *San Jose Mercury News, Inc.* (1993) 17 Cal.App.4th 1, 7-8, 14-15 [20 Cal.Rptr.2d 890] [statements that an attorney used " 'sleazy tactic[s]' " and engaged in a " ' "fishing expedition," ' " and supposition that the judge had a " 'dim view of the defense tactics' " qualify as opinion].)

In the present case, the comments about Ferlauto all related to Hamsher's discussion of the lawsuit against her, an event she took very personally. As Hamsher explained in the book: "If you've never been sued before, let me tell you, nothing can quite match the wild disbelief that courses through your whole body when you realize someone's going to take you to court." With that introduction, already having experienced over 60 pages of Hamsher's hyperbolic rhetoric, knowing that the movie was a major item in Hamsher's fledgling career, and knowing the headaches Vossler had

already caused her, no reader would expect Hamsher to suddenly change her tone in the book. Hamsher would not be expected to describe Vossler's legal attack with an arid, dispassionate, desiccated recital of bare facts. A reasonable reader would expect exactly what Hamsher provided—her highly partisan opinions of the lawsuit and her opponents, including Attorney Ferlauto.

Turning to the particular language alleged to be defamatory, the numerous descriptions of the lawsuit and the motion as "stupid," "laughed at," "a joke," "spurious," and "frivolous," are common characterizations which are nothing more than "the predictable opinion" of one side to the lawsuit. (*Information Control* v. *Genesis One Computer Corp., supra,* 611 F.2d at p. 784.) Use of such descriptive terms does not improperly attack appellant's competence or ethics and cannot be the basis for a defamation claim.

Nor is it of any significance that one of the above deprecating descriptions is from Hamsher's attorney. (*Information Control* v. *Genesis One Computer Corp., supra,* 611 F.2d at p. 784 [holding that statement of defendant's counsel that plaintiff corporation acted to avoid paying its obligations was nonactionable opinion].) Also contrary to Ferlauto's assertion, the mere passage of time between the events described and the publication of the book is not determinative. Regardless whether Hamsher is retelling what occurred five years ago or five days ago, the overall context of the book, the subject matter, and the author's literary style alert readers that they are reading the subjective views of a partisan participant to the events described. The publication date of the book would not affect the reader's view of the statements.

Caricature, imaginative expression, and rhetorical hyperbole, as used here, are often subject to the threat of a defamation action, but generally constitute a legitimate exercise of literary style. (*Milkovich* v. *Lorain Journal Co., supra,* 497 U.S. at p. 20 [110 S.Ct. at p. 2706]; *Baker* v. *Los Angeles Herald Examiner, supra,* 42 Cal.3d at pp. 263-264.) For example, the statements in the book that the judge in the Vossler litigation "laughed at their motion" and "thought their motion was a joke" are merely colorful descriptions of the incontestable fact that the court indeed denied Vossler's motion. Although the judge may not have literally laughed, authors are not limited to a sterile narrative of facts.

Hamsher's imaginative phrase "Kmart Johnnie Cochran" is also not actionable. Ferlauto asserts the phrase means that his legal services were of low quality and that he is unethical. The phrase is a lusty and creative expression of contempt, too loose and figurative to be susceptible of being proved true or false. (See *Hustler Magazine* v. *Falwell, supra,* 485 U.S. at pp.

53-55 [108 S.Ct. at pp. 880-882]; *James* v. *San Jose Mercury News, Inc.,* *supra,* 17 Cal.App.4th at p. 15.)

Similarly, the phrases "creepazoid attorney" and "loser wannabe lawyer" are classic rhetorical hyperbole which "cannot 'reasonably [be] interpreted as stating actual facts.' " (*Milkovich* v. *Lorain Journal Co., supra,* 497 U.S. at p. 20 [110 S.Ct. at p. 2706].) Hamsher's use of curse words, although not in good taste, are of course not to be taken literally. Her expressive phrases are merely name-calling of the "sticks and stones will break my bones" variety. They are epithets and subjective expressions of disapproval, devoid of any factual content, reflecting Hamsher's "vague expressions of low esteem" for Ferlauto. (*Copp* v. *Paxton* (1996) 45 Cal.App.4th 829, 838 [52 Cal.Rptr.2d 831] [use of the metaphoric expressions "keep him honest," "booby," and "baying in the ocean breezes" are subjective expressions of negative opinion with no disprovable factual content].) Hamsher's book recounts in detail the circumstances leading up to the Vossler lawsuit, and the bases for her colorful expressions of opinion are thoroughly disclosed with no fact of any significance falsely stated.

Hamsher's only factual error was in mistakenly labeling a motion for summary judgment one which was actually a motion for preliminary injunction. The error in identifying the type of motion filed was here of no consequence. Libel law "overlooks minor inaccuracies and concentrates on substantial truth." (*Masson* v. *New Yorker Magazine, Inc.* (1991) 501 U.S. 496, 516 [111 S.Ct. 2419, 2432, 115 L.Ed.2d 447].) What is critical in assessing whether a statement is capable of defamatory meaning is " 'the substance, the gist, the sting, of the libelous charge.' " (*Id.* at p. 517 [111 S.Ct. at p. 2433].) Moreover, when analyzing the statements in question, courts do so from the perspective of the average reader, not a person trained in the technicalities of the law. (*Morningstar, Inc.* v. *Superior Court, supra,* 23 Cal.App.4th at p. 688.) Whether it was a summary judgment motion or a preliminary injunction motion, is a minor inaccuracy which would have no effect on how the average reader would interpret the statements made. (See, e.g., *Braun* v. *Chronicle Publishing Co.* (1997) 52 Cal.App.4th 1036, 1050, fn. 6 [61 Cal.Rptr.2d 58] [misstating that a criminal investigation was started by the district attorney rather than by the state auditor did not change the gist or sting of the alleged libel].)

Moreover, several of the statements complained of actually do not concern Ferlauto. He cannot constitutionally establish liability unless he proves that the contested statements are " 'of and concerning,' " him either by name or by "clear implication." (*Blatty* v. *New York Times Co.* (1986) 42 Cal.3d 1033, 1042-1044 [232 Cal.Rptr. 542, 728 P.2d 1177].) Ferlauto, for example,

grossly distorts the text of the book by emphasizing the phrase "not an ethical one" from the following passage: "Well, we were already well aware that Rand [Vossler] had us over a barrel, but it was a time barrel, not an ethical one; had we had all the time in the world to take the thing to court, we knew we would've won. But we didn't." In other words, Hamsher felt no ethical barriers in proceeding with the film without Vossler, but realized that his lawsuit presented a logistical obstacle. The sentence simply does not imply that Ferlauto (who was never referred to by name in the book) was unethical; the phrase "not an ethical one" was not of and concerning him at all.

Similarly, the most natural reading of the remarks made by Hamsher and her attorney wherein they surmise the motive behind Vossler's filing the motion and the denial of her request for attorney fees (i.e., "some whore's son is filing a motion just to make me pay to defend it, even though it's preposterous," etc.) is that they were remarks about Vossler, not his un- named attorney. And, the most natural reading of the phrase "the meanest, greediest, low-blowing motherfuckers in Hollywood" is that it pertained not to Ferlauto, but rather to Vossler and to Tarantino, who at that stage did not want the film produced and thus was siding with Vossler. Moreover, the passage in which Hamsher's partner Murphy speculates before the fact that Vossler will "find some loser wannabe lawyer" to represent him only reflects Murphy's hypothetical expectations, rather than a specific allegation con- cerning the individual eventually hired. It is thus apparent that in addition to nonactionable, feisty expressions of permissible opinion, some of the state- ments complained of were not even directed at Ferlauto.

The totality of the circumstances test must be used (*Baker* v. *Los Angeles Herald Examiner, supra,* 42 Cal.3d at p. 260) in assessing the context of phrases from an evaluation of the entire book. (*Scott* v. *McDonnell Douglas Corp.* (1974) 37 Cal.App.3d 277, 291, fn. 11 [112 Cal.Rptr. 609].) The statements complained of may not be ripped out of context or, as Ferlauto seeks to do, defined from language in a review on the book's jacket asserting the "horrifically honest" nature of the book. It is apparent from the totality of the circumstances that Hamsher applies spicy prose in describing the making of a controversial film and describing her thoughts on everyone associated with it. In this context, and especially with her views born out of litigation to which she was adverse to Ferlauto, the average reader would deem her comments about Ferlauto as subjective expressions of opinion devoid of factual matter. (*Copp* v. *Paxton, supra,* 45 Cal.App.4th at p. 838.)

Since Ferlauto was not entitled to legal relief under any possible theory and there was no reasonable possibility the pleading could be cured (see

*Platt* v. *Coldwater Banker Residential Real Estate Services* (1990) 217 Cal.App.3d 1439, 1444 [266 Cal.Rptr. 601]), the trial court did not abuse its discretion in dismissing his second amended complaint without leave to amend. (*Hendy* v. *Losse* (1991) 54 Cal.3d 723, 742 [1 Cal.Rptr.2d 543, 819 P.2d 1].)

## DISPOSITION

The judgment is affirmed. Costs on appeal to respondents.

Zebrowski, J., and Mallano, J.,* concurred.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.