Filed 3/6/23  Noel v. Collier-Key CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| ANN NOEL et al., | C094292 |
| Plaintiffs and Respondents, | (Super. Ct. No. SCCVCVCV2020757) |
| v. | |
| DANA COLLIER-KEY, | |
| Defendant and Appellant. | |

Plaintiffs Ann and Robert Noel (collectively, the Noels; because plaintiffs share the same surname, this opinion refers to them individually by their first names to avoid confusion) and defendant Dana Collier-Key served at various times on the Klamath River Country Estates Owners Association (Association) board of directors (Board) and its committees.  After Collier-Key sent several derogatory email and social media messages about the Noels and their involvement in the Association, effectively accusing them of

1

criminal and unethical conduct, including engaging in an illegal kick-back scheme with a contractor hired to fix the Association's roads, they sued Collier-Key for defamation, among other things.

Collier-Key filed a special motion to strike the defamation cause of action under Code of Civil Procedure section 425.16, also known as the anti-strategic lawsuits against public participation (anti-SLAPP) statute, arguing the defamation claim implicated Collier-Key's constitutional free speech rights concerning public issues related to the Association's business and governance. (Statutory section citations that follow are found in the Code of Civil Procedure unless otherwise stated.) The trial court denied Collier-Key's anti-SLAPP motion, finding that although at least some of Collier-Key's statements qualified as protected activity related to a public issue, the Noels had shown a reasonable probability of success on the merits of their defamation claim. Collier-Key appeals that order.

Collier-Key contends the court erred in denying her anti-SLAPP motion because all of her statements constituted protected activity and the Noels failed to show a probability of success on the merits of their defamation claim. She also argues the court erred in declining to strike supplemental declarations from Ann and her attorney opposing the motion. Finding no merit to her contentions, we shall affirm.

FACTS AND HISTORY OF THE PROCEEDINGS

The Noels and Collier-Key both owned parcels in the Klamath River Country Estates residential development, a common interest development in rural Siskiyou County governed by the Association. Parcel owners within the common interest development constitute the voting members of the Association.

One of the Association's duties is to maintain the roads within the residential development. For that purpose, it has a volunteer roads committee that inspects the development's roads, reports on conditions, and prioritizes work that is needed. The

roads committee does not handle any Association money, and it does not award any Association contracts for the roadwork to be completed.

The Association is governed by the Board, and the Board elects officers, including a president, treasurer, and secretary. At various times, both the Noels and Collier-Key have served on the Board or otherwise volunteered on Association committees.

Collier-Key served as a Board member from January 2018 through January 2020, holding the positions of Board secretary and corporate secretary for a portion of that time in 2018. Ann was elected to the Board in 2019 as its corporate treasurer. Her husband, Robert, volunteered on the Association's road committee beginning in 2019.

Diana Gwaltney was a Board member and Association secretary during the time that Collier-Key was also on the Board. She averred on the Noels' behalf that Collier-Key would repeatedly verbally assault and bash Ann during open meeting sessions of the Board, which members of the Association attended. During those meetings, Collier-Key often accused Ann of embezzlement and of being a thief and breaching her fiduciary duty to the Association. Although Gwaltney and other Association members asked Collier-Key to present the Board with whatever proof she had to support her allegations against Ann regarding her alleged misconduct, Collier-Key never presented any documents or evidence to support her claims. Based on her own observations and experiences, Gwaltney believed that Collier-Key had a "deep-seated animosity, hatred, or ill-will" towards Ann, and that Collier-Key made her unsupported accusations against Ann with malice based on this all-consuming hatred.

Around October 2019, Collier-Key began sending several derogatory emails about Ann to other Board members and posted social media messages about Ann and Robert and their involvement in Association matters. Collier-Key's messages repeatedly accused Ann of engaging in a kick-back scheme with Gerard Pelletier Backhoe & Excavation (Pelletier), the contractor to whom the Association awarded the roads maintenance contract, and using the kickbacks to build a $10,000 deck on her residence,

3

which Collier-Key claimed the Noels could not afford because they almost lost their house in foreclosure.

The emails contained various statements to the effect that Ann had engaged in "past crimes," that she was a "lying whore of [S]atan," a "dumb ass whore[] of [S]atan," and that she was a "liar[] and fool[]." One email message called Ann a "scumbag" and also characterized Robert as her "woman beater husband," and insinuated that Robert had not actually walked and inspected the roads while volunteering on the roads committee.

Around February 2019, Collier-Key also began posting social media messages on KRCE.net, which is a Facebook group page moderated by Charles Gordon that currently has 187 Association members. According to Collier-Key and Gordon, KRCE.net constitutes the Association's social networking web page that is accessible to all Association members to " 'sound off' about Association governance." But according to Ann and Gwaltney, Gordon limits access to KRCE.net to only those persons who express views with which he agrees, and the web page is *not* a public forum to discuss Association business.

Similar to her email messages, Collier-Key's social media posts generally accused Ann of being a "loser[]," "liar[]," and a "thie[f]." Collier-Key again stated that Robert was a "woman-beating husband," and that Ann was a "whore." In one post, Collier-Key stated that Ann was "lying" and "wallowing in deception like a fat little pig in her slop" regarding the proper procedures for filling a vacant Board seat. In another post, Collier-Key accused Ann of "manipulating many documents in the past, including opening sealed files and changing numbers before mailing them out to 40 some people," thereby committing "[l]ayers upon layers of federal crimes."

Many of Collier-Key's social media posts between February 2020 and August 2020 suggested that the Noels improperly obtained money to construct a $10,000 deck on their home in a kick-back scheme with Pelletier, the road contractor. In one social media message, Collier-Key wrote that "She [Ann] just had a new deck built and is having a

4

roof put on. Mind you there [*sic*] were living hand to mouth before she got back on the board and the [*sic*] hired Peltier [*sic*] to over charge and kick down that bonus deck money. Buy her a roof next . . . [.]" She further posted that the Noels "were about to lose their house to foreclosure not too long ago. Now Peltier [*sic*] comes along and cha-ching home improvement money. Think about it."

Collier-Key also posted that "if [N]oel would have saved some of that $10,000 in deck money, she could have paid for her own campaign post cards." She accused Ann and other Board members, which she identified as "the crew," of hiring Pelletier, "a known crook," rather than two other reputable contractors to maintain the roads, and that the roadwork completed did not equal the amount paid for the jobs. Collier-Key further posted, "We can all see where the money went. By that I mean the [N]oel's new $10,000 deck that they could not afford before the roads scam was played out."

Based on the above-described emails and social media posts, the Noels sued Collier-Key for defamation. Collier-Key timely filed her anti-SLAPP motion as to the defamation cause of action.

We note that the Noels alleged in an amended complaint that after they filed suit, Collier-Key improperly gave a quitclaim deed for her residential property to her son in a conspiracy to render her judgment proof should the Noels prevail in their lawsuit. The second and third causes of action in the amended complaint to set aside a voidable transfer and conspiracy are not the subject of Collier-Key's anti-SLAPP motion.

Collier-Key argued (among other things) that as limited public figures who voluntarily injected themselves in Association business, the Noels could not show that she had made the statements with actual malice, i.e., with knowledge of their falsity or reckless disregard for their falsity, and that the Noels were unlikely to prevail on the merits because many of the statements concerning Association governance, a matter of public interest, were simply nonactionable hyperbolic opinion. Collier-Key submitted her own sworn statement describing the Association's duties, its contentious campaigns

5

for election to the Board, and controversies surrounding the roads committee and its recommendations for which roads to repair. She claimed that her critical comments of the Noels were not meant to be taken literally; rather, they were metaphorical insults made in the heat of contests for Association office and over disagreements for its proper governance.

The Noels opposed the motion, and filed supporting declarations from Ann, Robert, Gwaltney, and the Noels' attorney. They argued that Collier-Key failed to show her defamatory speech was protected and denied that they were public figures or limited public figures, that KRCE.net was a public forum, or that Collier-Key's statements related to an issue of public interest. They pointed to Collier-Key's admission that she did not know the source of the funds they used to build their decks, and Gwaltney's supporting declaration to show actual malice to the extent the court found that was required.

In reply, Collier-Key submitted a declaration from Gordon to establish that the KRCE.net Facebook page was a public forum. She also argued that words like "thief" and "liar" in the challenged communications constituted loose, figurative, or hyperbolic language that was constitutionally protected, and that the Noels had failed to show a probability of prevailing on the merits of their defamation claim. Collier-Key also made various evidentiary objections to the declarations of Ann and her attorney.

Several days before the hearing on the anti-SLAPP motion, the Noels filed supplemental declarations from Ann and their attorney. Collier-Key objected and moved to strike the supplemental declarations.

The court considered the anti-SLAPP motion at a hearing in May 2021. The court sustained in part and overruled in part the objections to Ann's original declaration. It also overruled Collier-Key's objections to the Noel's attorney's declaration and denied the motion to strike both of the supplemental declarations.

6

Regarding the anti-SLAPP motion, the court found that Collier-Key had sustained her burden of showing that portions of the defamation cause of action arose from protected free speech in connection with a public issue. The court concluded that the anti-SLAPP statute applied to homeowner's associations and that caselaw providing for a broad construction of a "public forum" weighed in favor of finding that the KRCE.net Facebook page qualified as a public forum. With respect to Ann, the court found that she was a limited public figure since she put herself in a public position in the Association by becoming a member of the Board.

The court then found that under the second step in the analysis, the Noels had satisfied their burden of showing that they had a probability of prevailing on the merits of their defamation cause of action. Because the Noels had met their burden of showing "minimal merit" to their claim, the court denied the anti-SLAPP motion. Collier-Key timely appealed.

## DISCUSSION

### I

*Special Motions to Strike SLAPP Lawsuits*

After "finding there had been 'a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances[,]' " the Legislature enacted section 425.16 to provide a remedy against such chilling lawsuits. (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 815, fn. 1.) The statute " 'sets out a procedure for striking complaints in harassing lawsuits that are commonly known as SLAPP suits . . ., which are brought to challenge the exercise of constitutionally protected free speech rights.' " (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788 (*Monster Energy*).)

Under the anti-SLAPP procedure, a cause of action arising from an *act* by the defendant *in furtherance of the person's right of petition or free speech under the United*

*States Constitution or the California Constitution in connection with a public issue* is subject to a special motion to strike, unless the court determines the plaintiff has established that there is a probability that plaintiff will prevail on the claim. (§ 425.16, subds. (a), (b)(1).) The statute defines the italicized text above as (1) any written or oral statement or writing made before a legislative, executive or judicial proceeding or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest. (§ 425, subd. (e).) " 'The anti-SLAPP statute does not insulate defendants from *any* liability for claims arising from the protected rights of petition or speech. It only provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity.' " (*Monster Energy, supra*, 7 Cal.5th at p. 788.)

Resolving an anti-SLAPP motion requires the trial court to engage in a two-step review process. (*Monster Energy, supra*, 7 Cal.5th at p. 788.) First, the court decides whether the defendant has made a threshold showing that the challenged claim arises from protected activity under section 425.16. (*Ibid.*) If the defendant makes the requisite showing, the burden then shifts to the plaintiff to demonstrate the claim's merit by establishing a probability of success similar to a summary judgment analysis. (*Ibid.*)

At this second step, the court does not weigh evidence or resolve conflicting factual claims, but instead limits its inquiry to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. (*Monster Energy, supra*, 7 Cal.5th at p. 788.) In doing so, the court accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine

if it defeats the plaintiff's claim as a matter of law.  (*Ibid.*)  A plaintiff seeking to establish the merit of a claim " 'may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence.' "  (*Ibid.*)  Claims that satisfy this "minimal merit" threshold may proceed.  (*Ibid.*)

Whether the defendant has shown that a claim arises from protected activity and whether the plaintiff has demonstrated a probability of prevailing on the merits are questions of law that we review independently on appeal.  (*Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 807; *Monster Energy, supra*, 7 Cal.5th at p. 788.)  In making these determinations, we consider "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based."  (§ 425.16, subd. (b)(2).)  "We are not bound by the trial court's analysis and will affirm the trial court's decision if it is correct on any theory applicable to the case."  (*Price v. Operating Engineers Local Union No. 3* (2011) 195 Cal.App.4th 962, 970.)

II

*Protected Activity*

The trial court found that Collier-Key had met her burden under the first prong of the section 425.16 analysis to show that portions of the defamation cause of action arose from protected free speech related to a public issue, which was made in a public forum, the KRCE.net Facebook page.  While the Noels assert that the KRCE.net site may actually be a private forum, rather than a public one like the trial court found, we decline to address this contention because it is raised only in a footnote and is not specified by a separate heading or subheading, as required by California Rules of Court, rule 8.204(a)(1)(B).  (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 542; *Roberts v. Lomanto* (2003) 112 Cal.App.4th 1553, 1562 [reviewing court may disregard contention asserted in footnote but not raised in a properly headed argument].)

9

We agree with the trial court that several of the challenged statements qualified as protected activity under the anti-SLAPP statute because they related to Ann's activities and duties as a member of the Board and her credibility as a Board member or of other issues of interest to the Association members, such as Robert's performance as a volunteer on the Association's road committee.

To the extent the trial court found that certain emails Collier-Key sent to Ann and other Board members (described in paragraphs nine, 10, 11, and 14 of the amended complaint) were not made in a public forum, and thus were not protected, we conclude otherwise. Section 425.16, subdivision (e)(4) includes *conduct* in furtherance of free speech rights regardless whether that conduct occurs in a place where ideas are freely exchanged; the subdivision "governs even private communications, so long as they concern a public issue." (*Wilbanks v. Wolk* (2004) 121 Cal.App.4th. 883, 897.) Here, the emails generally discussed Ann's alleged past criminal conduct against the Association and its members while serving on the Board, her supposed dishonesty and poor management while an elected Board member, and her husband's alleged shoddy and dishonest work as a volunteer on the Association roads committee, all of which would have been issues of interest to the Association members.

Likewise, to the extent the court concluded that certain social media posts were not protected by the anti-SLAPP statute because they did not concern issues pending before or of interest to the Association (described in paragraphs 16 through 19 of the amended complaint), we again disagree. The posts in question insinuated that certain members of the Board, which Collier-Key referred to as "the crew," including Ann, improperly fired an Association contractor that was doing a good job of preventing the Association's money from being stolen, that none of the Association members should believe Ann or anything in the Association's newsletter (the Klamagram), whether Collier-Key would be voted back on the Board during Association elections and how she would serve with other potential or current Board members, including Ann, and how

10

Ann, while serving on the Board, refused Collier-Key's request to clean up a dilapidated property within the Association.  The content of these social media posts related to topics of undoubted interest to the Association and its members as they touched on governance, elections, and duties of the Board and its volunteers.  (*Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 474-475, 479 [allegedly defamatory statements concerning the manner in which a large residential community would be governed concerned issues of public interest]; *Silk v. Feldman* (2012) 208 Cal.App.4th 547, 553 [courts have recognized a homeowners association functions as a quasi-governmental entity, paralleling the powers and duties of a municipal government].)

Because we are not bound by the trial court's specific rulings as to each of the alleged defamatory statements (*Price v. Operating Engineers Local Union No. 3, supra*, 195 Cal.App.4th at p. 970 [reviewing court not bound by trial court's analysis in ruling on an anti-SLAPP motion]), and because we conclude the challenged emails and social media posts generally addressed public issues of importance to Association members, including proper Association governance and management as well as the fitness for duty of certain Board members and volunteers, including the Noels, we conclude, as the trial court ultimately did, that Collier-Key satisfied her burden under the first prong of the anti-SLAPP analysis.  We thus turn to whether the Noels satisfied their burden under the statute to show a probability of success on the merits.

III

*Probability of Prevailing on Merits*

Collier-Key contends the Noels have failed to demonstrate a probability of prevailing on their defamation claim.  She argues that several of the statements constitute nonactionable hyperbolic rhetoric or opinion, some statements were protected by the common interest privilege, and others are too vague to be defamatory.  She further

11

contends the Noels failed to prove she made the statements with actual malice, and failed to establish special damages.

These arguments have no merit.

To establish a reasonable probability of success on the merits, the Noels " 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence' " they submitted is credited. (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821.) We accept the Noels' evidence as true and evaluate Collier-Key's evidence only to determine if it defeats the Noels' claims as a matter of law. (*Monster Energy, supra*, 7 Cal.5th at p. 788.) We do not determine credibility, weigh the evidence, or resolve conflicting factual claims. (*Ibid.; Silk v. Feldman, supra*, 208 Cal.App.4th at p. 554.)

A.      *False Statement of Fact or an Opinion that Implies a Undisclosed False Factual Basis*

"The tort of defamation 'involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage.' " (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720.) Defamation exposes the defamed person to "hatred, contempt, ridicule or obloquy or cause[s] the person to be shunned or avoided or injured in his or her occupation ([Civ. Code,] § 45, defining libel), or which charge[s] the person with crime, suggest[s] that the person has an infectious or loathsome disease or is impotent or unchaste, tend[s] to injure the person in his or her business or profession, or otherwise cause[s] actual damage ([Civ. Code,] § 46, defining slander)." (*Rothman v. Jackson* (1996) 49 Cal.App.4th 1134, 1140.)

To determine whether a given statement is libelous, "we look to what is explicitly stated as well as what insinuation and implication can be reasonably drawn from the communication. [Citation.] . . . In this connection the expression used as well as the

12

'whole scope and apparent object of the writer' must be considered." (*Forsher v. Bugliosi* (1980) 26 Cal.3d 792, 803.)

An essential element of defamation is that the publication in question contains a false statement of *fact*. (*Gregory v. McDonnel Douglas Corp.* (1976) 17 Cal.3d 596, 600; *Savage v. Pacific Gas & Electric Co.* (1993) 21 Cal.App.4th 434, 444-445.) A fact can be proven to be false, an opinion cannot be. (See Judicial Counsel of California Civil Jury Instructions (Rev. June 2013) CACI No. 1707 ["A statement of fact is one that can be proved to be true or false"].)

The question whether a given communication contains a statement of fact or opinion is one of law for the court. (*Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260.) "In making such a determination, the court must place itself in the position of the hearer or reader, and determine the sense or meaning of the statement according to its natural and popular construction." (*Ibid.*) Based on the language used and the totality of the surrounding circumstances, the court determines whether the average reader or hearer "could have reasonably understood the alleged defamatory statement to be one of fact." (*Id.* at p. 261.) However, even a statement of opinion may be actionable "if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." (*Okun v. Superior Court* (1981) 29 Cal.3d 442, 451-452; see Judicial Council of California Civil Jury Instructions (Rev. June 2013) CACI No. 1707 [under some circumstances, a plaintiff "may recover if a statement phrased as an opinion implies that a false statement of fact is true"].)

In *Ferlauto v. Hamsher* (1999) 74 Cal.App.4th 1394, 1397-1398, an attorney sued the author of a book who referred to him variously as "Kmart Johnnie Cochran," "creepazoid attorney" and "loser wannabe lawyer." The court concluded that this was "classic rhetorical hyperbole" not actionable as defamation. (*Id.* at pp. 1403-1404.) The court reasoned that the phrase "Kmart Johnnie Cochran" "is a lusty and creative

13

expression of contempt, too loose and figurative to be susceptible of being proved true or false." (*Id.* at p. 1403.)

Likewise, in *Seelig v. Infinity Broadcasting Corp., supra*, 97 Cal.App.4th 798, a radio talk show referred to the plaintiff, a participant in a contest to marry a wealthy stranger, as a " 'local loser,' " " 'chicken butt,' " and " 'big skank.' " (*Id.* at pp. 810-813.) The court concluded that the statements were not actionable because "they were unquestionably statements of the speaker's subjective judgment" and "fall into the realm of 'classic rhetorical hyperbole which "cannot 'reasonably [be] interpreted as stating actual facts.' " ' " (*Id.* at p. 810.)

In *Rosenaur v. Scherer* (2001) 88 Cal.App.4th 260, Rosenaur sued his political opponents, Scherer and others, for defamation stemming from a heated exchange at a shopping center where one of the defendants called the plaintiff a "thief" and a "liar." (*Id.* at p. 278.) The court concluded that the statements were not actionable, explaining: "In this case, taken in context, Scherer's purported use of the word 'thief' and 'liar' in the course of a chance confrontation with a political foe at a shopping center was the type of loose, figurative, or hyperbolic language that is constitutionally protected. [Citation.] Specifically, in the context of a heated oral exchange at a shopping center in the midst of a hard-fought initiative contest, anyone who might have overheard Scherer call plaintiff a thief or a liar would have understood Scherer to be furious at, and critical of, plaintiff's position, but would not likely have thought that Scherer's supposed outburst was accusing plaintiff of a criminal past or of dishonesty in his business dealings . . . ." (*Id.* at p. 280.)

Like in *Ferlauto*, *Seelig*, and *Rosenaur*, we agree that at least some of Collier-Key's statements involve classic hyperbole as she argues. For example, Collier-Key's references to Ann being a whore of Satan, a dumbass, a fat little pig wallowing in her slop, a scumbag, or even insane arguably constitute colorful figurative language showing

14

her low opinion of Ann. However, we disagree that all of Collier-Key's statements constitute nonactionable hyperbole or opinion.

We observe here that while some of the alleged hyperbolic statements alone might not support a defamation cause of action does not mean the allegations must be excised from the amended complaint, especially since they provide context and are relevant on the issue of malice. (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 394 ["[a]llegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute"].)

The question is whether a reasonable person who read the statements that accused Ann and Robert of accepting some sort of kick-back from Pelletier that they then used to pay for a personal deck on their home after they almost lost their home in foreclosure, that Robert was a woman-beater husband, and that Ann had committed numerous federal crimes, including tampering with or manipulating Association documents before mailing or opening sealed files, would have interpreted them as stating fact or opinion. To state that Ann had essentially committed bribery or other federal crimes similar to mail-tampering while she was a Board member implies that Collier-Key had knowledge that Ann had committed crimes for which she could be prosecuted. The same applies to the statements about Robert being a woman-beater, which imply that Collier-Key had knowledge that Robert had physically assaulted a woman, another prosecutable offense. While Collier-Key asserts that beating a woman might not necessarily equate with criminal conduct, as it is conceivable Robert acted in self-defense and thus committed no crime, such a nuanced, legal interpretation runs counter to what a lay person likely would understand the phrase "woman-beater" to mean. In considering whether the language used is defamatory we "look ' "not so much [to the allegedly libelous statement's] effect when subjected to the critical analysis of a mind trained in the law, but [to] the natural and probable effect upon the mind of the average reader." ' " (*Ferlauto v. Hamsher, supra*, 74 Cal.App.4th at p. 1401.)

15

In our view, a reasonable lay reader or listener would have concluded that Collier-Key was accusing Ann and Robert of having engaged in specific criminal conduct rather than merely loose rhetoric describing a political foe. Her comments clearly accuse Ann of criminal and ethical violations regarding her duties to the Association as a Board member. And, we believe, an average reader would have understood that the statements that Robert was a "woman-beater" meant that he physically beat a woman without any legal justification such as self-defense. These statements are not hyperbole, but statements of fact, provable to be true or false. And such statements--accusing Robert and Ann of identifiable crimes--if false, naturally tended to subject Ann and Robert to "hatred, contempt, ridicule or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation" (Civ. Code, § 45) by other members of the Board or the Association.

To the extent Collier-Key argues some of the alleged statements are "too vague" to be defamatory, this argument, too, is without merit. As the Noels point out, "[t]here is no requirement that the person defamed be mentioned by name." (*DiGiorgio Fruit Corp. v. American Federation of Labor and Congress of Indus. Organizations* (1963) 215 Cal.App.2d 560, 569.) "It is sufficient if from the evidence the jury can infer that the defamatory statement applies to the plaintiff[,]" or "if the publication points to the plaintiff by description or circumstance tending to identify him." (*Id.* at pp. 569-570.) Collier-Key's vagueness argument essentially ignores that she published the social media posts to a targeted audience--members of the residential development the Association governed, where the Noels also lived. Thus, it is reasonably probable that the readers of Collier-Key's posts understood that defendant was writing about the Noels and accusing them of dishonesty and potentially of criminal behavior regarding their actions on the Board and roads committee, especially since the chain of social media posts often *did* identify them by name when accusing them of criminal activity.

16

B.    *Actual Malice*

In determining whether the Noels have met their burden of demonstrating a probability of prevailing on the merits, we must consider whether they qualify as private or public figures.  "[A] private person need prove only negligence (rather than malice) to recover for defamation."  (*Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 742.)

A libelous statement is made with "actual malice" when the speaker knows the statement is false or makes the statement with reckless disregard of whether it was false.  (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 256.)  Actual malice may be proved by direct or circumstantial evidence.  (*Id.* at pp. 257-258.)  Evidence of the publisher's motive and intent, a failure to investigate, anger and hostility toward the plaintiff, reliance upon sources known to be unreliable or known to be biased against the plaintiff may, in an appropriate case, indicate that the publisher himself entertained serious doubts regarding the truth of his publication.  (*Reader's Digest*, at pp. 257-258.)

The trial court here found that Ann was a limited public figure because she put herself in a public position within the Association by becoming an elected Board member.  The court made no such finding as to Robert.

We need not decide whether the court properly concluded that Ann and not Robert was a limited public figure.  (*Ampex Corp. v. Cargle* (2005) 128 Cal.App.4th 1569, 1577 ["[t]he limited purpose public figure is an individual who voluntarily injects him or herself or is drawn into a specific public controversy, thereby becoming a public figure on a limited range of issues"].)  Even if we assume, for purposes of argument, that both qualify as limited public figures given Ann's status as an elected Association Board member and Robert's position as a volunteer Association roads committee member, the evidence presented on the motion was sufficient to prove Collier-Key acted with the requisite malice in defaming them.  In our view, the evidence presented in the trial court on the motion to strike, if credited by the trier of fact, is sufficient to establish actual

17

malice, that is, to establish that Collier-Key, in making the alleged statements, acted out of hatred or ill will toward the Noels and that she lacked a reasonable basis for believing in the truth of her statements.

Collier-Key repeatedly accused the Noels of accepting what amounts to a $10,000 bribe from the Association's road contractor to build a deck on their home. Both Ann and Robert, however, denied any involvement in any kick-back scheme and specifically averred that they saved their money and used family money to purchase the deck. If credited, this evidence shows that Collier-Key's published statements were false.

Collier-Key admitted in her discovery responses that she *did not know* the source of the funds the Noels used to build their deck. Thus, she had no reasonable basis for believing that the Noels obtained the money to build their deck from an illegal kick-back scheme at the Association's expense.

Collier-Key's contention that her statement regarding Robert being a "woman-beater" was apparently true, or that she reasonably believed it to be true, also finds no support in the record. Although she claimed in the trial court that her declaration supporting her motion to strike established the basis for this assertion--that some unidentified female victim had described Robert's alleged assault to Collier-Key--a review of Collier-Key's actual declaration shows it makes *no* such averment. In fact, Collier-Key's declaration noticeably omits *any reference whatsoever* to the alleged female victim, whether the unidentified person was reliable, or what that unknown person may or may not have told her about Robert. Thus, the only admissible evidence before the trial court was Robert's declaration stating that Collier-Key's woman-beating accusation was false.

Ann also averred and Robert confirmed that Collier-Key had "made it clear over the years, both publicly and privately, that she has a well-established hatred of [Ann], and animosity, anger and hostility toward [her], to the point that [Ann] even fear[ed] that she will cause [her] physical bodily harm." At some point, Collier-Key circled Ann's name

18

on a piece of paper in the office and wrote "Evil" next to it after the Association hired a new office employee so the new employee would understand how Collier-Key viewed Ann. Ann believed that Collier-Key's deep hatred of her possibly arose after the Association took Collier-Key's mother to small claims court for failing to pay assessments. If credited at trial, a trier of fact might reasonably conclude that Collier-Key made many of the defamatory statements as payback for a perceived wrong to her mother, which fueled Collier-Key's animosity towards Ann, and not because Collier-Key reasonably believed the defamatory statements to be true.

Gwaltney's declaration, if believed by the trier of fact, further supports a finding that Collier-Key deeply hated Ann and had no basis for accusing her of dishonesty and other criminal conduct. According to Gwaltney, Collier-Key would viciously attack Ann during Association meetings, repeatedly accusing her of embezzlement, of being a thief, and of breaching her fiduciary duties to the Board. Collier-Key *never* provided any proof to substantiate her criminal and misconduct allegations against Ann, even though Gwaltney and other Association members requested evidence to support her serious accusations. Based on her own personal observations of Collier-Key and Ann, it was Gwaltney's opinion that Collier-Key held a deep-seated animosity or hatred towards Ann and that Collier-Key made baseless accusations of a criminal nature against Ann.

And, as the Noels point out, Collier-Key's own vitriolic words tended to show that she harbored a deep hatred of Ann. For example, Collier-Key repeatedly described Ann as a "lying whore of [S]atan." The word "whore" is commonly understood as a derogatory term that means a promiscuous or immoral woman (see https://perma.cc/HM5F-H3N6, visited Feb. 23, 2023), and Satan is perhaps the most-hated figure in Christianity. (See https://perma.cc/43QR-4N75, visited Feb. 23, 2023 [defining Satan as "the rebellious angel who in Christian belief is the adversary of God and lord of evil"].) Collier-Key's repeated use of such a derogatory phrase reveals her extreme resentment or hatred of Ann. Thus, while such language may be hyperbolic

19

rhetoric and may not be sufficient to establish malice alone, it nevertheless tends to support the Noels' claim that Collier-Key acted without regard to whether the statements she made were true, blinded by her hatred of Ann. (*Baral v. Schnitt, supra*, 1 Cal.5th at p. 394 [contextual allegations of protected activity, even if they do not support a claim for recovery, not stricken under the anti-SLAPP statute].)

Finally, we note that Collier-Key did not file a declaration with her reply brief below denying or otherwise contradicting the declarations of Ann, Robert, or Gwaltney. Instead, Collier-Key filed only Gordon's declaration in response, which did not address or deny in any manner whatsoever Collier-Key's all-consuming hatred of Ann or the basis for her challenged statements. Thus, nothing in Collier-Key's evidence rebutted the Noels' malice showing as a matter of law. (*Monster Energy, supra*, 7 Cal.5th at p. 788.)

C.     *Nonprivileged Communication*

Collier-Key argues that some of her comments were protected by the common interest privilege, but she never raised that issue below. Points not raised in the trial court may not be raised for the first time on appeal. (*Degnan v. Morrow* (1969) 2 Cal.App.3d 358, 366.)

Regardless, the common interest privilege only protects certain communications made without malice. (Civil Code, § 47, subd. (c)(1) ["A privileged publication or broadcast is one made: [¶] . . . [¶] (c) In a communication, without malice, to a person interested therein, (1) by one who is also interested . . ."]; *Taus v. Loftus, supra*, 40 Cal.4th at p. 721.) Having determined that sufficient evidence on the motion to strike established actual malice if credited by the trier of fact, the common interest privilege would not apply.

D.     *Special Damages*

Collier-Key also claims in her reply brief on appeal that the Noels cannot show a probability of prevailing because they failed to demonstrate special damages. A review

20

of Collier-Key's moving and reply papers shows she never raised the issue of special damages in the trial court, instead focusing only on whether the statements constituted actionable defamatory statement of fact or nonactionable hyperbolic opinion. She cannot do so now for the first time on appeal. (*Degnan v. Morrow, supra,* 2 Cal.App.3d at p. 366.)

In any event, " '[w]here the statement is defamatory *on its face*, it is said to be libelous per se, and actionable without proof of special damage.' " (*Silk v. Feldman, supra*, 208 Cal.App.4th at p. 555; Civ. Code, § 45a ["A libel which is defamatory of the plaintiff without the necessity of explanatory matter . . . is said to be a libel on its face"].) Collier-Key's emails and social media posts on their face repeatedly accused the Noels of engaging in a kick-back scheme that essentially amounts to bribery and a serious breach of fiduciary duty, accused Ann of committing numerous federal crimes, including tampering with Association mail or sealed files, and accused Robert of committing a criminal battery on a woman. Such statements are "libelous per se." (*Silk*, at p. 556 [reviewing court deemed letter accusing former homeowner's association Board member of breaching her fiduciary duty by using her position as a Board member to settle a lawsuit against the board so that she could obtain free parking spaces as libelous per se]; *Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1127 [recognizing that false accusations of criminal conduct, "which are among the most clear and egregious types of defamatory statements" are "libel per se"]; *Barnes-Hind, Inc. v. Superior Court* (1986) 181 Cal.App.3d 377, 385 [false accusation of " 'dishonesty or questionable business methods' " are libel per se].)

The evidence the Noels presented adequately showed that their defamation cause of action was legally sufficient and had minimal merit, and none of Collier-Key's evidence defeats their claim as a matter of law. Thus, the trial court properly denied Collier-Key's anti-SLAPP motion to strike.

Finally, although we conclude the trial court did not err in denying Collier-Key's anti-SLAPP motion, we reject the Noel's suggestion that they are entitled to attorneys' fees on appeal because there was "no good reason" to appeal the court's adverse ruling.

IV

*Supplemental Declarations*

Defendant contends that the trial court erred in declining to strike the supplemental declarations filed by Ann and her attorney a few days before the hearing on the anti-SLAPP motion to strike. She contends considering the untimely declarations deprived her of due process and the opportunity to rebut the supplemental declarations with additional declarations or other evidence. Assuming the supplemental declarations were untimely, the record shows any alleged error in considering them was harmless. (*Waller v. TJD, Inc.* (1993) 12 Cal.App.4th 830, 833 ["[p]rejudice is not presumed, and the burden is on the appealing party to demonstrate that a miscarriage of justice has occurred"].)

Ann's supplemental declaration sought to establish that the KRCE.net Facebook page maintained by Gordon was not a public forum, an issue Gwaltney's declaration already addressed. Despite considering her supplemental declaration, the court found in favor of Collier-Key's position and against the Noels that the KRCE.net page was a public forum. Thus, any consideration of Ann's supplemental declaration did not prejudice Collier-Key.

Similarly, the original declaration of the Noels' attorney, which was timely filed, attested to Collier-Key's responses to certain discovery requests for admissions, including that she made the statements attributed to her and that she did not know the source of funds the Noels used to build their deck. The attorney's supplemental declaration reiterated the same information, and merely attached the actual discovery request and response as exhibits. The court overruled Collier-Key's evidentiary

22

objections to the attorney's original declaration, and Collier-Key does not raise any issue on appeal regarding that evidentiary ruling. Thus, any error in considering the supplemental attorney declaration was harmless as the court had already admitted the same evidence by overruling Collier-Key's objections to the attorney's original declaration.

## DISPOSITION

The trial court's order denying Collier-Key's anti-SLAPP motion to strike is affirmed. The Noels shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1)-(2).)


_____

                  HULL, Acting P. J.


We concur:


_____

MAURO, J.


_____

BOULWARE EURIE, J.